1   HOLLAND & KNIGHT LLP
    Michael T. Jones (SBN 290660)
2   Rebecca G. Durham (SBN 319403)
    560 Mission Street, Suite 1900
3   San Francisco, CA 94105
    (415) 743-6900
4   m.jones@hklaw.com
    rebecca.durham@hklaw.com
5
    Additional Counsel for Plaintiff listed at end
6
    *Attorneys for Plaintiff Jefferies Funding LLC*
7

8                    UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF CALIFORNIA
9                       SAN FRANCISCO DIVISION

10  JEFFERIES FUNDING LLC,                  Case No.: 3:24-cv-05639-SK

11              Plaintiff,                  **DECLARATION OF MICHAEL T.
                                            JONES IN SUPPORT OF
12         v.                               PLAINTIFF'S REQUEST FOR ENTRY
                                            OF DEFAULT**
13  DASAGROUP HOLDINGS CORP. (d/b/a
    KICKHASS AVOCADOS) and LONDON
14  FRUIT, INC,                             *[Plaintiff's Request for Entry of Default
                                            Against Defendant and Cross-Defendant
15              Defendants.                 London Fruit, Inc. and [Proposed] Order Filed
                                            Herewith]*
16
17                                          Complaint Filed: August 21, 2024
                                            TRIAL DATE: NONE SET
18
    DASAGROUP HOLDINGS CORP. (d/b/a
19  KICKHASS AVOCADOS),

20  Counter- and Cross-Claimant,

21  v.

22  JEFFERIES FUNDING LLC,

23  Counter-Defendant

24  and LONDON FRUIT, INC,

25              Cross-Defendant

26

**DECLARATION OF MICHAEL T. JONES IN SUPPORT OF          HOLLAND & KNIGHT LLP
PLAINTIFF'S REQUEST FOR ENTRY OF DEFAULT                    560 Mission Street, Suite 1900
CASE NO. 3:24-CV-05639 – PAGE 1**                           San Francisco, CA 94105
                                                          Telephone: (415) 743-6900

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## DECLARATION OF MICHAEL T. JONES

I, Michael T. Jones, declare and state:

1.      I am an attorney duly licensed to practice law in the State of California. I am a Partner at the law firm Holland & Knight LLP, attorneys for Plaintiff Jefferies Funding LLC ("Jefferies").  I make this declaration in support of Plaintiff's Request for Entry of Default Against Defendant London Fruit, Inc. ("London Fruit" or "Defendant").

2.      All of the statements herein are of my personal knowledge, except where stated upon information or belief.  If called to testify, I could and would competently testify thereto.

3.      On August 21, 2024, Plaintiff filed the instant complaint against the Defendants.  A copy of the Complaint is attached hereto as Exhibit A. *See also* Dkt. No. 1.

4.      On or about August 26, 2024, London Fruit was served by in-person service upon an employee authorized to accept service of process at London Fruit's office located at 9010 S. Cage Blvd., Pharr, Texas 78577, as evidenced by the Affidavit of Service on file with this Court. The Affidavit of Service for London Fruit is attached hereto as Exhibit B. *See also* Dkt. No. 10.

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000. *See* Compl. ¶15.  This Court has personal jurisdiction over London Fruit under California's long-arm statute, Cal. Code Civ. Proc § 410.10, because London Fruit maintains an office at 1925 Jerrold Ave., San Francisco, California 94124-1602 and conducts substantial business activities within California. *See* Compl. ¶¶ 16-18.

6.      London Fruit's deadline to respond to Jefferies' Complaint was September 16, 2024. *See* Fed. R. Civ. P. 12(a)(1)(A)(i) (21 days from service).  The time within which London Fruit may answer or otherwise move with respect to the Complaint has expired.  In discussions with counsel for London Fruit, Jefferies agreed to extend London Fruit's time to respond to the complaint by thirty days, up and until October 16, 2024.  London Fruit opted not to file a stipulation memorializing this extension

**DECLARATION OF MICHAEL T. JONES IN SUPPORT OF
PLAINTIFF'S REQUEST FOR ENTRY OF DEFAULT**
CASE NO. 3:24-CV-05639 - PAGE 2

**HOLLAND & KNIGHT LLP**
560 Mission Street, Suite 1900
San Francisco, CA 94105
Telephone: (415) 743-6900

1    as it did not want to retain California counsel and formally appear in this matter.  The extension has

2    now expired, and London Fruit has not answered or otherwise moved with respect to the Complaint.

3        7.    Therefore, I respectfully request this Court grant Plaintiff's Request for Entry of Default

4    on the Complaint against Defendant London Fruit. This request is made pursuant to Federal Rule of

5    Civil Procedure 55(a) on the basis that London Fruit has failed to respond or appear in this action.

6        I declare under the penalty of perjury of the laws of the United States of America that the

7    foregoing is true and correct to the best of my ability.

8        Executed this 8th day of November 2024 in San Francisco, CA.

9                        */s/ Michael T. Jones_____*
                        Michael T. Jones

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**DECLARATION OF MICHAEL T. JONES IN SUPPORT OF
PLAINTIFF'S REQUEST FOR ENTRY OF DEFAULT
CASE NO. 3:24-CV-05639 - PAGE 3**

# EXHIBIT A

1  HOLLAND & KNIGHT LLP
   Michael T. Jones (SBN 290660)
2  Rebecca G. Durham (SBN 319403)
   560 Mission Street, Suite 1900
3  San Francisco, CA 94105
   (415) 743-6900
4  m.jones@hklaw.com
   rebecca.durham@hklaw.com
5
   Additional Counsel for Plaintiff listed at end
6
   *Attorneys for Plaintiff Jefferies Funding LLC*
7

8              UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF CALIFORNIA
9            SAN FRANCISCO / OAKLAND DIVISION

10 | JEFFERIES FUNDING LLC, | Case No.: |
   |---|---|
11 | Plaintiff, | **PLAINTIFF JEFFERIES FUNDING LLC'S COMPLAINT** |
12 | v. | |
13 | DASAGROUP HOLDINGS CORP. (d/b/a KICKHASS AVOCADOS) and LONDON FRUIT, INC, | **JURY TRIAL DEMANDED** |
14 | | |
15 | Defendants. | |

16
17      Comes now Plaintiff JEFFERIES FUNDING LLC for its complaint against defendants

18 DASAGROUP HOLDINGS CORP. (d/b/a KICKHASS AVOCADOS) and LONDON FRUIT, INC.,

19 and alleges as follows:

20                    **NATURE OF THE DISPUTE**

21      1.      Plaintiff Jefferies Funding LLC ("Jefferies") provided non-party Silo Capital Resources

22 I LLC ("Silo Capital") with a secured financing facility to finance Silo Technologies, Inc.'s ("Silo

23 Technologies" or, with Silo Capital, "Silo") business of purchasing agricultural trade receivables from

24 sellers of produce (the "Facility").

25      2.      In June of 2022, Silo Technologies entered into a Master Service Agreement with

26 Defendant Dasagroup Holdings Corp. (d/b/a Kickhass Avocados) ("Kickhass") to purchase certain

---

**PLAINTIFF JEFFERIES FUNDING LLC'S COMPLAINT**:
CASE NO. _____ - PAGE 1

HOLLAND & KNIGHT LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Telephone: (415) 743-6900

receivables.  Among the receivables purchased from Kickhass are those related to produce buyer, London Fruit, Inc. ("London Fruit") (the "Affected Receivables").  These Affected Receivables were pledged by Silo Capital as collateral to Jefferies to secure the Facility.

3.  Silo Capital defaulted under the Facility and entered into a forbearance agreement with Jefferies thereafter on May 8, 2024 (the "Silo Forbearance Agreement").  Pursuant to the Silo Forbearance Agreement, Silo Technologies repurchased the Affected Receivables from Silo Capital and then issued a note to Jefferies which is secured by all of Silo Technologies' assets, including the Affected Receivables.

4.  Silo Technologies has not received the money it is owed on the Affected Receivables because (i) London Fruit has failed to make full payment, in breach of its purchase agreement(s) with Kickhass; and / or (ii) the payments London Fruit did make were improperly received and retained by Kickhass in breach of the Master Service Agreement.

5.  For months, Kickhass fraudulently represented that London Fruit had not made payments, inducing Silo and Jefferies to refrain from bringing claims against Kickhass.  However, Silo and Jefferies recently learned that London Fruit had in fact made payments directly to Kickhass, which Kickhass improperly retained.

6.  Upon learning of the payments, Silo and Jefferies demanded that Kickhass immediately pay what Silo is owed.  Nevertheless, Kickhass wrongfully retained and exercised control over these payments which constitutes conversion and theft.

7.  On June 19, 2024, Jefferies entered into a forbearance agreement with Silo Technologies and Kickhass (the "Kickhass Forbearance Agreement").  The Kickhass Forbearance Agreement provided that Jefferies would forbear from exercising its rights with respect to the Affected Receivables if Kickhass made payments into a Jefferies Payment Account on a set payment schedule.

8.  Kickhass has failed to comply with the terms of the Kickhass Forbearance Agreement including by failing to make the last seven payments required thereunder in full.  Indeed, as of August 20, 2024, Kickhass is $1,500,000 behind on the agreed-upon payment plan in the Kickhass Forbearance

**PLAINTIFF JEFFERIES FUNDING LLC'S COMPLAINT**:
CASE NO. _____ - PAGE 2

**HOLLAND & KNIGHT LLP**
560 Mission Street, Suite 1900
San Francisco, CA 94105
Telephone: (415) 743-6900

Agreement.

9.      Yet, from review of Kickhass's bank statements, Kickhass received at least $1.6 million in payments from London Fruit in May 2024, at least $1.2 million in June, and at least $770,000 in July. This totals at least $3.57 million in payments made directly from London Fruit to Kickhass—nearly $1 million more than Kickhass was obligated to pay to Silo and Jefferies.  Despite having received the money and then some it owed to Silo and Jefferies, Kickhass repeatedly defaulted on the required progress payments, keeping the money that belonged to Silo and Jefferies for Kickhass's own purpose.

10.      On an August 6, 2024 phone call, Kickhass's CEO candidly admitted to Silo that Kickhass had retained some London Fruit payments that should have gone to Silo and diverted them to Kickhass's own business operations. At no time did Mr. Ward or Kickhass admit that Kickhass had received and diverted more than $3.5 million while falling significantly behind on its payments owed to Silo.

11.      In this action, Jefferies, as a secured creditor under UCC § 9-607 with regard to the Affected Receivables, seeks to enforce Silo's right to payment and performance.

## **THE PARTIES**

12.      Jefferies Funding LLC is, and at all times mentioned herein was, a Delaware limited liability company with its principal place of business in New York, New York.  Its sole member is Jefferies Financial Group Inc., a New York corporation with its principal place of business in New York, New York.  Jefferies Financial Group Inc., which is publicly traded on the New York Stock Exchange, is one of the world's leading full-service investment banking and capital markets firms.

13.      On information and belief, Dasagroup Holdings Corp. (d/b/a Kickhass Avocados) is, and at all times mentioned herein was, a Delaware corporation with its principal place of business in Shoreline, Washington.

14.      On information and belief, London Fruit, Inc. is, and at all times mentioned herein was, a Texas corporation with its principal place of business in Pharr, Texas.

**PLAINTIFF JEFFERIES FUNDING LLC'S COMPLAINT**:
CASE NO. _____ - PAGE 3

**HOLLAND & KNIGHT LLP**
560 Mission Street, Suite 1900
San Francisco, CA 94105
Telephone: (415) 743-6900

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.

16.     This Court has personal jurisdiction over Kickhass and London Fruit under California's long-arm statute, Cal. Code Civ. Proc § 410.10.

17.     The Master Service Agreement between Kickhass and Silo Technologies (*see infra*, ¶¶ 17-19) is governed by California law.  Pursuant to the terms of the Master Service Agreement, Kickhass was required to direct London Fruit, as a Produce Buyer, to remit payment on invoices directly to Silo's Payment Account – a California bank account.

18.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## GENERAL ALLEGATIONS

**A.     Relationship between Kickhass, London Fruit and Silo Technologies**

19.     Silo Technologies provides short-term financing to sellers of produce and other perishable food ("Produce Sellers") by purchasing their receivables.

20.     In short, Silo Technologies purchases a Produce Seller's open invoices (receivables) to selected buyers ("Produce Buyers"), providing the Produce Sellers with an up to 90% advance on the value of the invoices.  The Produce Seller and Silo Technologies then instruct the Produce Buyers to remit payment on the invoices directly to a Silo bank account ("Silo's Payment Account").

21.     On or about June 5, 2022, Kickhass, a Produce Seller, executed an Instant Pay Program Order Form ("Order Form") with Silo Technologies.  *See* Exhibit A.  The Order Form provided that *"This Order Form, Customer's use of the Silo Instant Pay program, and receipt of any related services is subject to our Master Service Agreement which is incorporated herein by reference."*  The Order Form then includes a link to the referenced Master Service Agreement.

22.     The Master Service Agreement, attached hereto as Exhibit B, is the agreement between Silo Technologies on the one hand and each of the Produce Sellers that participate in the instant pay

---

**PLAINTIFF JEFFERIES FUNDING LLC'S COMPLAINT**:
CASE NO. _____ - PAGE 4

HOLLAND & KNIGHT LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Telephone: (415) 743-6900

program on the other.

23.     In compliance with the terms of the Master Service Agreement, Kickhass informed Silo Technologies that it intended to make receivables with respect to a certain Produce Buyer, London Fruit, available to Silo Technologies for purchase.

24.     Thereafter, Silo Technologies determined London Fruit was an eligible obligor under the terms of the Master Service Agreement and provided Kickhass with the purchase terms on which Silo Technologies was willing to purchase the receivables with respect to London Fruit.  Kickhass accepted the purchase terms and London Fruit's receivables became "Purchased Receivables" under the Master Service Agreement.

25.     In February and March of 2024, London Fruit purchased produce from Kickhass resulting in the Affected Receivables.

26.     London Fruit has defaulted on its payments for the Affected Receivables.

27.     On multiple occasions in April and May of 2024, Kickhass falsely represented to Silo and Jefferies that London Fruit had not made payments on the Affected Receivables.  In justifiable reliance on those representations, Silo and Jefferies refrained from pursuing claims against Kickhass.

28.     And on May 23, 2024, on a call between Silo, Jefferies, Kickhass and London Fruit, Jerry Garcia, London Fruit's General Manager, acknowledged that London Fruit owed money and represented that the company had recently been acquired and was increasingly late on its Accounts Payable, information that seemed to corroborate Kickhass's representations regarding London Fruit's failure to make payments on the Affected Receivables.

29.     However, Kickhass's representations were knowingly false, intended to induce Silo and Jefferies to refrain from pursuing claims against Kickhass.

30.     At Kickhass's direction, London Fruit made partial payments on the Affected Receivables directly to Kickhass.  Kickhass improperly retained these payments and did not re-direct them to Silo.

31.     In fact, a review of Kickhass's bank statements shows that Kickhass received at least

**PLAINTIFF JEFFERIES FUNDING LLC'S COMPLAINT**:
CASE NO. _____ - PAGE 5

**HOLLAND & KNIGHT LLP**
560 Mission Street, Suite 1900
San Francisco, CA 94105
Telephone: (415) 743-6900

1   $1.6 million in payments from London Fruit in May 2024, at least $1.2 million in June 2024 and at least

2   $770,000 in July 2024.  This totals at least $3.57 million in payments made directly from London Fruit

3   to Kickhass—nearly $1 million more than Kickhass was obligated to pay to Silo and Jefferies.  Despite

4   having received the money and then some it owed to Silo and Jefferies, Kickhass repeatedly defaulted

5   on the required progress payments, keeping the money that belonged to Silo and Jefferies for Kickhass'

6   own purpose.

7       32.   Further, on an August 6, 2024 call, Kickhass CEO Felipe Ward candidly admitted that

8   Kickhass had retained payments that should have gone to Silo and that he had diverted them for

9   Kickhass's own business operations.  At no time did Mr. Ward or Kickhass admit that Kickhass had

10  received and diverted more than $3.5 million while falling significantly behind on its payments owed

11  to Silo.

12      33.   Section 5 of the Master Service Agreement (Collections) provides, in relevant part:

13          [Kickhass] acknowledges that (a) Silo will direct all payments made on any
            Purchased Receivable ("Collections") to Silo's Payment Account, in the
14          ordinary course . . . .

15          If [Kickhass] receives any Collections directly from [London Fruit],
            [Kickhass] will direct such Collections in full to Silo's Payment Account.
16          [Kickhass] acknowledges that it has no legal title to such funds and agrees
            to hold the amount of such Collections in trust for the benefit of Silo until
17          such funds are deposited in Silo's Payment Account.

18      34.   Section 18 of the Master Service Agreement (Default) provides, in relevant part:

19          Each of the following events will constitute an "Event of Default":

20
21          •   [Kickhass] fails to pay any obligation due to Silo under this
                Agreement, including in respect of Adjustments or Repurchase
22              Amounts, or takes any action to interfere with the ability of Silo
                to collect obligations owed to it hereunder.

23
24          •   [Kickhass] (i) directs [London Fruit] to make payment on account
                of a Purchased Receivable to an account other than Silo's
25              Payment Account or (ii) fails to direct [London Fruit] to make
                payment on account of all Purchased Receivables into Silo's
26              Payment Account.

**PLAINTIFF JEFFERIES FUNDING LLC'S COMPLAINT**:
CASE NO. _____ - PAGE 6

**B.      Relationship between Silo Technologies, Silo Capital and Jefferies**

35.      Silo Technologies acquires receivables from Produce Sellers, including in this instance, Kickhass, and then sells them to an indirect, wholly-owned special-purpose entity, Silo Capital.  Silo Capital is a special-purpose entity used by Silo Technologies to warehouse receivables.

36.      Jefferies had provided Silo Capital with a secured financing facility to finance Silo's business of purchasing these agricultural trade receivables from sellers of produce.  The Facility was secured by Silo Capital's portfolio of purchased receivables, including the Affected Receivables.

37.      Silo defaulted under the documents that governed the Facility.

38.      On May 8, 2024, Silo and Jefferies entered into the Silo Forbearance Agreement.  Under the Silo Forbearance Agreement, Silo Technologies repurchased the Affected Receivables from Silo Capital and issued a note to Jefferies that is secured by all of Silo Technologies' assets, including the Affected Receivables.

39.      Accordingly, Jefferies is a secured party under the Uniform Commercial Code with respect to the Affected Receivables.

40.      Section 9-607 of the UCC allows a secured party, if so agreed or in the event of default, to exercise the rights of a debtor in enforcing obligations of third parties on collateral.  The secured creditor has the right to collect payment directly from the debtor's account debtors.

41.      Specifically, Section 9-607(a) provides, in relevant part:

If so agreed, and in any event after default, a secured party

(1) may notify an account debtor or other person obligated on collateral to make payment or otherwise render performance to or for the benefit of the secured party …

(3) may enforce the obligations of an account debtor or other person obligated on collateral and exercise the rights of the debtor with respect to the obligation of the account debtor or other person obligated on collateral to make payment or otherwise render performance to the debtor, and with respect to any property that secures the obligations of the account debtor or other person obligated on the collateral

42.      On June 19, 2024, Jefferies entered into the Kickhass Forbearance agreement with Silo

---

**PLAINTIFF JEFFERIES FUNDING LLC'S COMPLAINT**:
CASE NO. _____ - PAGE 7

Technologies and Kickhass.  *See* Exhibit C.

43.     The Kickhass Forbearance Agreement provided that Jefferies would forbear from exercising its rights as a secured creditor in relation to the Affected Receivables if Kickhass made payments into a Jefferies Payment Account on a set payment schedule.

44.     Kickhass has failed to make the last seven payments in full required by the Kickhass Forbearance Agreement.

45.     This failure constitutes a Forbearance Default under Section 4.5 of the Kickhass Forbearance Agreement as well as an Event of Default under the Master Services Agreement.

46.     As of August 1, 2024, the outstanding amount due and owing to Silo under the Affected Receivables is at least $2,896,031.23.

## COUNT I: BREACH OF CONTRACT (against Kickhass)

47.     Jefferies repeats, realleges, and incorporates paragraphs 1 through 46 as if fully set forth herein.

48.     The Master Service Agreement is a valid, binding, and enforceable contract between Silo Technologies and Kickhass, which assigned Kickhass' rights to payment regarding the Affected Receivables to Silo.

49.     Silo Technologies has issued a note to Jefferies that is secured by all of Silo Technologies' assets, including the Affected Receivables.

50.     Silo Technologies has fully performed its obligations under the Master Service Agreement.

51.     Under the Master Service Agreement, in the event Kickhass receives any payments on Purchased Receivables directly from an obligor, Kickhass is required to direct such payments in full to Silo's Payment Account. *See* § 5.  Furthermore, under the Master Service Agreement, Kickhass is "responsible for all costs or expenses that [Silo] incur[s] in the process of collecting amounts owed but not timely paid, including legal or collections fees, and [is] responsible for paying interest on such

**PLAINTIFF JEFFERIES FUNDING LLC'S COMPLAINT**:
CASE NO. _____ - PAGE 8

**HOLLAND & KNIGHT LLP**
560 Mission Street, Suite 1900
San Francisco, CA 94105
Telephone: (415) 743-6900

amounts at the maximum rate permitted by law."  *See* § 6.  Additionally, under the Master Service Agreement and Order Form, Kickhass agreed to pay Silo certain late fees if the amount owed to Silo is outstanding beyond the Maturity Date.  *Id*.

52.    London Fruit made certain payments with respect to the Affected Receivables directly to Kickhass (i.e., to deposit accounts other than Silo's Payment Account), but Kickhass failed to direct such payments to Silo's Payment Account.  This is a breach of Section 5 of the Master Service Agreement and an Event of Default under Section 18 of the Master Service Agreement.

53.    A review of Kickhass's bank statements shows that Kickhass has received at least $1.6 million in payments from London Fruit in May 2024, at least $1.2 million in June 2024 and at least $770,000 in July 2024.  This totals at least $3.57 million in payments made directly from London Fruit to Kickhass—nearly $1 million more than Kickhass was obligated to pay to Silo and Jefferies.  Despite having received the money and then some it owed to Silo and Jefferies, Kickhass repeatedly defaulted on the required progress payments, keeping the money that belonged to Silo and Jefferies for Kickhass's own purpose.

54.    Kickhass's CEO openly admitted that certain payments made by London Fruit were retained to fund aspects of Kickhass's business.

55.    As of August 1, 2024, the total amount of payments with respect to the Affected Receivables that have not been timely made to Silo's Payment Account, with late fees, is at least $2,896,031.23.

56.    Because Jefferies has a security interest in all of Silo's assets, including the Affected Receivables, it has been harmed by Kickhass' breach of the Master Service Agreement.

57.    As a direct result of Kickhass' breach, Jefferies has incurred damages in an amount not less than $2,896,031.23, plus all costs of collection, including attorneys' fees incurred in this action.

### **COUNT II: FRAUD (against Kickhass)**

58.    Jefferies repeats, realleges, and incorporates paragraphs 1 through 57 as if fully set forth herein.

---

**PLAINTIFF JEFFERIES FUNDING LLC'S COMPLAINT**:
CASE NO. _____ - PAGE 9

59.     On multiple occasions in April and May of 2024, Kickhass represented to Silo and Jefferies that London Fruit had not made payments on the Affected Receivables.  This was false.

60.     At Kickhass's direction, London Fruit made partial payments on the Affected Receivables directly to Kickhass, not to Silo's Payment Account as required.  Kickhass improperly retained these payments and did not re-direct them to Silo Technologies.  These statements constitute affirmative misrepresentations and concealment with knowledge of their falsity.

61.     Kickhass made these statements with the intent to defraud Silo and Jefferies and induce their reliance on such statements.

62.     Silo and Jefferies did, in fact, rely on the misrepresentations by refraining from pursuing legal action against Kickhass.

63.     As a direct and proximate result of relying on Kickhass' fraudulent statements and not pursuing legal action sooner, Jefferies has suffered damages, in an amount to be proven.

## COUNT III: CONVERSION (against Kickhass)

64.     Jefferies repeats, realleges, and incorporates paragraphs 1 through 63 as if fully set forth herein.

65.     London Fruit made payments on the Affected Receivables directly to Kickhass when the payments were required to be made directly to Silo's Payment Account.

66.     From review of Kickhass's bank statements, Kickhass has received at least $1.6 million in payments from London Fruit in May 2024, at least $1.2 million in June 2024 and at least $770,000 in July 2024.  This totals at least $3.57 million in payments made directly from London Fruit to Kickhass—nearly $1 million more than Kickhass was obligated to pay to Silo and Jefferies.  Despite having received the money and then some it owed to Silo and Jefferies, Kickhass repeatedly defaulted on the required progress payments, keeping the money that belonged to Silo and Jefferies for Kickhass's own purpose.

67.     These payments were wrongfully retained by Kickhass, fully aware that London Fruit failed to pay Silo in full and that approximately $2,896,031.23 of the Affected Receivables remain

**PLAINTIFF JEFFERIES FUNDING LLC'S COMPLAINT**:
CASE NO. _____ - PAGE 10

**HOLLAND & KNIGHT LLP**
560 Mission Street, Suite 1900
San Francisco, CA 94105
Telephone: (415) 743-6900

outstanding.

68.     Kickhass retained these payments without re-directing them to Silo and has refused to re-direct such payments to Silo despite demands by Silo and Jefferies.

69.     Accordingly, Kickhass has wrongfully exercised control over and deprived Silo of its personal property.

70.     Silo has a possessory interest in the payments made on the Affected Receivables. Because Silo issued a note to Jefferies that is secured by all of Silo Technologies' assets, including the Affected Receivables, Jefferies also maintains a possessory interest in these payments.

71.     Accordingly, Jefferies was harmed by Kickhass' wrongful retention of Silo's property. And Kickhass' wrongful exercise of control over Silo's property was a substantial factor is causing damage to Jefferies.

## COUNT IV: BREACH OF CONTRACT (against London Fruit)

72.     Jefferies repeats, realleges, and incorporates paragraphs 1 through 71 as if fully set forth herein.

73.     Kickhass and London Fruit entered into valid, binding, and enforceable contracts for the sale of produce.

74.     The Master Service Agreement is a valid, binding, and enforceable contract between Silo and Kickhass, which assigned Kickhass' rights to payment regarding the Affected Receivables to Silo.

75.     Silo Technologies has issued a note to Jefferies that is secured by all of Silo Technologies' assets, including the Affected Receivables.

76.     Upon information and belief, London Fruit received and accepted all produce from Kickhass pursuant the parties' contracts.

77.     Upon Silo's purchase of the Affected Receivables, all payments were to be made directly to Silo's Payment Account.

**PLAINTIFF JEFFERIES FUNDING LLC'S COMPLAINT**:
CASE NO. _____ - PAGE 11

**HOLLAND & KNIGHT LLP**
560 Mission Street, Suite 1900
San Francisco, CA 94105
Telephone: (415) 743-6900

78.     London Fruit failed to pay Silo in full and approximately $2,896,031.23 of the Affected Receivables remain outstanding.

79.     Because Jefferies has a security interest in all of Silo's assets, including the Affected Receivables, it has been harmed by London Fruit's failure to (i) pay in full and (ii) remit all payments to directly to Silo's Payment Account.

80.     As a direct result of London Fruit's failure to remit proper payment, Jefferies has incurred damages in an amount not less than $2,896,031.23, plus costs of collection, including attorneys' fees incurred in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1.     Awarding Plaintiff monetary damages in an amount not less than $2,896,031.23;

2.     Awarding Plaintiff punitive damages, as warranted, in an amount to be determined at trial;

3.     Awarding prejudgment interest on all amounts awarded;

4.     Awarding Plaintiff its reasonable attorneys' fees and expenses and costs of suit; and

5.     Granting such other relief as the case may require or as may be deemed just and proper.

## JURY TRIAL DEMAND

Plaintiff requests a jury trial on all questions of fact raised by its Complaint.

DATED THIS 21st day of August, 2024.

HOLLAND & KNIGHT LLP


_s/    Michael T. Jones_____
Michael T. Jones (SBN 290660)
Rebecca G. Durham (SBN 319403)

560 Mission Street, Suite 1900
San Francisco, CA 94105
(415) 743-6900
m.jones@hklaw.com
rebecca.durham@hklaw.com

Martin L. Seidel
Stosh M. Silivos
Kelly McNeill
787 Seventh Ave., 31st Floor
New York, NY 10019
(212) 513-3200
martin.seidel@hklaw.com
stosh.silivos@hklaw.com
kelly.mcneill@hklaw.com

*Attorneys for Plaintiff Jefferies Funding LLC*

PLAINTIFF JEFFERIES FUNDING LLC'S COMPLAINT:
CASE NO. _____ - PAGE 13

HOLLAND & KNIGHT LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Telephone: (415) 743-6900

**Exhibit A**



**Instant Pay Program Order Form**

| Customer Name: | | Dasagroup Holdings Corp (Kickhass Avocados) | | Customer Address: | | 1140 N 192ND #505 Shoreline, WA 98133 |
|---|---|---|---|---|---|---|

Customer Contact: Felipe Ward

Customer Billing Contact:

Customer Contact Email: felipe@kickhass.com

Customer Billing Contact Email:

*Offer Terms Valid through:* **Thursday, May 19, 2022**

| | Start Date | End Date | Advance Rate | Transaction Fee | Silo Core Customer Discount | Final Transaction Fee |
|---|---|---|---|---|---|---|
| **Silo Instant Pay Program Terms** | 5/12/2022 | *N/A* | 90% | 2.00% | 0.00% | 2.00% |

**Program Details:**

-Silo will review your last 12-24 months of sales and collections

-Silo will work with you to select customers that you want to include in the Instant Pay program

-Silo will help you change the payment instructions on your invoices so that your customers' payments will be directed to Silo Collections

-Silo will begin advancing payment on invoices to approved customers starting 2-3 days after the invoice date

-Payment will be sent via ACH and typically arrive in 1-2 business days

-Silo will process payments received from your customer on your behalf

-Payments received on funded invoices will be sent to your account via ACH net of any amount due to Silo (e.g., advance amount and transaction fee)

-A 14 day grace period is added to the invoice terms to allow time to receive customer payments. Payments received after the grace period "Maturity Date" will be assessed a late fee.

-Late fee schedule (prorated on a daily basis): 1-30 days after Maturity Date (Final Transaction Fee + 0.5%), 31+ days after Maturity Date (Final Transaction Fee + 1.5%)

**Terms of Service:**

This Order Form, Customer's use of the Silo Instant Pay program, and receipt of any related services is subject to our Master Service Agreement which is incorporated herein by reference.

Master Service Agreement

By signing below, the parties hereby agree to all the terms and conditions of this Order and Master Service Agreement.

Silo Technologies, Inc.

Signature: Matt Chappell

Printed Name: Matt Chappell

Title: Vice President of Sales

Date: 6/6/2022

Customer

Signature: _____

Printed Name: Felipe Ward

Title: CEO/president

Date: 6/5/2022

# Exhibit B

# SUPPLIER RECEIVABLE SALES

## *Silo Instant Pay Program*

This Supplier Receivable Sales Agreement (this "<u>Agreement</u>") is entered into between the entity identified as a customer on the Order (the "<u>Supplier</u>" or "<u>you</u>") and Silo Technologies Inc. ("<u>Silo</u>," "<u>we</u>" or "<u>us</u>"). Capitalized terms used and not defined elsewhere in this Agreement are defined in <u>Section 27</u>.

BY EXECUTING AN ORDER THAT INCORPORATES THIS AGREEMENT BY REFERENCE, YOU AGREE TO THE TERMS OF THIS AGREEMENT. BY INDICATING YOUR ACCEPTANCE TO THIS AGREEMENT, YOU REPRESENT THAT YOU ARE AN AGENT OF CUSTOMER AND HAVE THE AUTHORITY TO BIND CUSTOMER TO THE TERMS AND CONDITIONS IN THIS AGREEMENT. IF YOU DO NOT HAVE SUCH AUTHORITY, YOU MUST NOT ACCEPT THIS AGREEMENT AND MAY NOT USE THE SERVICES.

From time to time the Supplier enters into commercial trade transactions with Obligors for the sale of goods and/or services resulting in invoices payable (as further defined in <u>Section 27</u>, "<u>Receivable(s)</u>") owed by each relevant Obligor to Supplier.

Under the terms of this Agreement, the Supplier may choose to make Receivables available for sale to Silo as a means to generate liquidity for the Supplier. Silo will determine in its sole and absolute discretion whether to make an offer to purchase any such Receivable and the terms of any such offer. This Agreement applies to each Receivable that the Supplier makes available to Silo for purchase. All amendments and waivers to this Agreement must be in writing and signed by Supplier and Silo.

## 1. Purchase and Sale of Receivables.

### Eligibility

From time to time during the term of this Agreement, the Supplier may notify Silo in writing that it intends to make Receivables with respect to a certain Obligor available to Silo for purchase. Upon receipt of such notification, Silo will determine in its sole and absolute discretion whether such Obligor is eligible for the Silo Instant Pay Program (an "<u>Eligible Obligor</u>").  In addition to other conditions, Silo requires proof of at least one full sales and payment collections cycle  as well as up-to-date contact information (e-mail and phone number) for each Obligor.

If Silo determines that such Obligor is an Eligible Obligor, then Silo will provide to the Supplier the terms (the "<u>Purchase Terms</u>") on which Silo is willing to purchase Receivables with respect to such Eligible Obligor from the Supplier.  The Purchase Terms will include, among other things, (i) the Transaction Fee and (ii) the Reduction Reserve applicable to all Receivables with respect to such Eligible Obligor.  You should review the Purchase Terms carefully before agreeing to sell any Receivables under this Agreement.

The Supplier may elect to accept or reject the Purchase Terms.  Any acceptance must be delivered by the Supplier to Silo in writing. You acknowledge that Silo may change its determination regarding

1

any Obligor's eligibility at any time (though any such change will not affect Receivables already purchased by Silo at the time of such change).

Silo may change the Purchase Terms with respect to any Obligor at any time in its sole and absolute discretion by providing the Supplier with notice of such change. Upon receipt of such modified Purchase Terms, the Supplier may elect to accept or reject the modified Purchase Terms. If the Supplier accepts the modified Purchase Terms, then the Receivables with respect to the applicable Eligible Obligor will continue to be made available for purchase by Silo pursuant to this <u>Section 1</u> *(Purchase and Sale of Receivables)*.

## Offer and Acceptance

Each time the Supplier places a sales order for goods and/or services to an Eligible Obligor (each such sales order, a "Transaction") the Supplier will deliver to Silo information regarding the Transaction, including the goods and/or services included in the sales order and the face amount of the related Receivable(s) (such information, the "<u>Transaction Details</u>"). Please review the Transaction Details carefully and ensure they are accurate.

If the Supplier accepts the applicable Purchase Terms with respect to a given Eligible Obligor, then, until such time as Supplier notifies Silo otherwise in accordance with <u>Section 19</u> *(Term and Termination)*, after delivery of the Transaction Details, the Supplier will be deemed to offer to sell to Silo the Receivable(s) arising out of the related Transaction unless the Supplier opts out in accordance with the terms of this paragraph. To opt out of offering a Receivable to Silo for purchase, the Supplier must deliver a written notice to Silo via email **by 5:00 p.m. pacific standard time on the day that the corresponding Transaction Details were provided to Supplier**, stating that Supplier does not wish to offer such Receivable for purchase. If the Supplier does not deliver such a notice to Silo with respect to a given Transaction, then, at 5:00 p.m. pacific standard time on the day that the Transaction Details were delivered to the Supplier, the Supplier automatically shall be deemed to offer to sell to Silo the Receivable(s) arising out of that Transaction.

Silo may accept the offer by depositing the Upfront Purchase Price therefore (calculated in accordance with <u>Section 2</u>) in the Supplier's Designated Account. Upon the depositing of the Upfront Purchase Price, the Supplier shall be deemed to have sold and assigned to Silo all right, title and interest in such Receivable. For the avoidance of doubt, Silo shall have no obligation to purchase any Receivable from the Supplier under this Agreement, and may elect to accept or reject any offer for the purchase and sale of Receivables in its sole and absolute discretion.

Receivables that are offered to Silo and that are purchased pursuant to the terms of this Agreement are referred to as "<u>Purchased Receivables</u>" (provided that a Receivable that is subsequently repurchased by Supplier pursuant to the terms of this Agreement ceases to be a Purchased Receivable upon repurchase).

By entering into any purchase and sale of Receivables under this Agreement (a "<u>Transaction</u>"), Supplier acknowledges review of the Transaction Details provided with respect to such Transaction and confirms that all such information, together with information from other sources that the Supplier has provided or authorized Silo to review, is correct, complete, and acceptable. Supplier will promptly update previously provided information that is no longer correct or complete.

2

Silo reserves the right at any time to suspend any receivables purchase functionality, including any advance approval and authorization process, and require that the Supplier offer specific Receivables for sale to Silo.

The Supplier's decision to sell certain Receivables to Silo does not require that it continue selling Receivables to Silo in the future. The Supplier may elect to stop selling Receivables to Silo at any time, with requisite notice, in accordance with the provisions of Section 19 *(Term and Termination)*.

## 2. Purchase Price.

The Purchase Price for each Purchased Receivable is calculated as follows:

**"Purchase Price" = Net Face Value – Transaction Fee**, in which:

"Net Face Value" means, with respect to any Receivable, the face amount of the Receivable, net of any Adjustments (other than the Reduction Reserve) specifically taken into account in determining the Purchase Price for such Receivable as of the applicable Purchase Date.

"Transaction Fee" means a fee set forth in the Purchase Terms, which will be calculated as a percentage of the Net Face Value of the Receivable.

The Supplier is required to reimburse Silo for any Adjustments with respect to any Purchased Receivables or for certain Repurchase Events set forth in Section 8 *(Repurchases)* below. In order to provide the necessary adjustments on account of Adjustments or Repurchase Events, Silo will maintain a Reduction Reserve from the Purchase Price and as a result will pay the full Purchase Price for each Purchased Receivable in two installments: (1) on the Purchase Date, an upfront portion of the Purchase Price, determined by reducing the Purchase Price by the required Reduction Reserve for each Purchased Receivable and (2) a Deferred Purchase Price equal to the remaining portion of the Reduction Reserve *less* the Transaction Fee, payable on the date that such Deferred Purchase Price has to be paid in accordance with Section 3 *(Deferred Purchase Price Mechanics)* below. Silo's obligation to pay the Deferred Purchase Price will be offset against the Supplier's obligation to pay to Silo the amount of any Actual Reduction Amount in accordance with the terms of Section 3 *(Deferred Purchase Price Mechanics)*.

Accordingly, the Purchase Price for each Purchased Receivable will be payable as follows:
(i)     an initial payment equal to the Upfront Purchase Price will be paid to the Supplier on the Purchase Date, and
(ii)    a second installment equal to the Deferred Purchase Price (as defined below) will be paid on the Deferred Purchase Price Payment Date in the manner set forth in Section 3 *(Deferred Purchase Price Mechanics)*.

| "Upfront Purchase Price" | Net Face Value **minus** Reduction Reserve |
|---|---|
| "Reduction Reserve" | 10% of Net Face Value (variable based on agreed upon terms) |

3

| "Deferred Purchase Price" | Reduction Reserve *minus* Transaction Fee |
|---|---|

# 3. Deferred Purchase Price Mechanics.

Following the Purchase Date, the outstanding balance of a Purchased Receivable may be reduced as a result of an Adjustment. If, on any day following the Purchase Date for any Purchased Receivable, the outstanding balance of that Purchased Receivable is reduced as a result of any Adjustment, the Supplier will be deemed to have received on such day a Collection in respect of that Purchased Receivable in the amount of the Adjustment that must be paid over to Silo pursuant to Section 7 *(Adjustments)*. Additionally, following the Purchase Date, the Supplier may be required to repurchase a Purchased Receivable in its entirety pursuant to Section 8 *(Repurchases)* for a repurchase price equal to the Repurchase Amount (as defined in Section 8 *(Repurchases)*).

As used in this Agreement, the "Actual Reduction Amount" with respect to any Purchased Receivable means the greater of (i) the amount of all Adjustments with respect to such Purchased Receivable, other than Adjustments taken into account in determining the Purchase Price of such Purchased Receivable as of the Purchase Date and (ii) any Repurchase Amount with respect to such Purchased Receivable as determined under Section 8 *(Repurchases)*.

With respect to any Purchased Receivable:
- If the Actual Reduction Amount is *greater than* the Reduction Reserve of such Purchased Receivable, then the amount by which the Actual Reduction Amount exceeds the Reduction Reserve is the "Reduction Reserve Deficit".
- If the Actual Reduction Amount is *less than* the Reduction Reserve of such Purchased Receivable, then the amount by which the Reduction Reserve exceeds the Actual Reduction Amount is the "Reduction Reserve Surplus".

As used in this Agreement, the "Deferred Purchase Price Payment Date" with respect to any Purchased Receivable is the Maturity Date of such Purchased Receivable or such other date as the parties may agree to in writing from time to time.:

On the Deferred Purchase Price Payment Date for each Purchased Receivable, the Deferred Purchase Price will be payable to the Supplier in the following manner:
- If there is a Reduction Reserve Surplus for that Receivable, then Silo will pay to the Supplier an amount equal to the Reduction Reserve Surplus *minus* the Transaction Fee.
- If there is a Reduction Reserve Deficit for that Receivable, then the Supplier will pay to Silo an amount equal to the Reduction Reserve Deficit *plus* the Transaction Fee.

***The following examples are provided for illustrative purposes only*** to demonstrate the calculation of the amount payable on the Deferred Purchase Price Payment Date:

**Scenario #1:**
If:

     Net Face Value (NFV): $100 *[initial value of Purchase Order]*
     Reduction Reserve: 15% of NFV *[amount withheld from upfront payment]*
     Transaction Fee: 2% of NFV *[Silo fee]*

4

Collections: $90 *[adjusted value of Purchase Order after product is sold and negotiation, if any, is complete]*

Then:

Purchase Price: $98 *[initial value of Purchase Order minus $2 (or 2%) for Silo transaction fee]*

Upfront Purchase Price: $85 *[amount paid upfront]*

Deferred Purchase Price: $13 *[difference between purchase price ($98) and upfront purchase price ($85)]*

Actual Reduction Amount: $10 *[amount the Purchase Order was reduced by after negotiation]*

Reduction Reserve <u>Surplus</u>: $5 *[adjusted purchase price of $90 minus upfront payment of $85]*

Payment on Deferred Purchase Price Payment Date:  Silo pays the Supplier $3 *[the other part of the $5 ($2) went to Silo for the transaction fee]*

**Scenario #2:**

If:

Net Face Value (NFV): $100 *[initial value of Purchase Order]*

Reduction Reserve: 15% of NFV *[amount withheld from upfront payment]*

Transaction Fee: 2% of NFV *[Silo fee]*

Collections: $80 *[adjusted value of Purchase Order after product is sold and negotiation, if any, is complete]*

Then:

Purchase Price: $98 *[initial value of Purchase Order minus $2 (or 2%) for Silo transaction fee]*

Upfront Purchase Price: $85

Deferred Purchase Price: $13

Actual Reduction Amount: $20 *[amount the Purchase Order was reduced by after negotiation]*

Reduction Reserve <u>Deficit</u>: $5 *[adjusted purchase price of $80 minus upfront payment of $85]*

Payment on Deferred Purchase Price Payment Date:  Supplier pays Silo $7 *[the amount owed to Silo due to negotiated purchase price being less than the original value]*

The aggregate Reduction Reserve Deficit and aggregate Reduction Reserve Surplus in respect of all Purchased Receivables payable on any day by or to Supplier may be offset against each other in making the determination as to what payments are required on such day.

## 4. Information About Supplier

The Supplier agrees that Silo may review available information about the Supplier or the Supplier's beneficial owners, affiliates, or Obligors from multiple sources, including information provided to Silo by Silo's affiliates and service providers, or information provided by the Supplier in using Silo's platform, to determine the Purchase Terms offered to the Supplier to decide whether to purchase a given Receivable.

By entering into this Agreement, the Supplier agrees that Silo may obtain and review information about the Supplier and its Obligors from such sources as Silo believes to be relevant. If requested, the Supplier will provide Silo with such documentation or additional information as Silo may reasonably request in connection with proposed Transactions. The Supplier agrees to provide accurate and complete information to Silo in connection with each proposed Transaction.

## 5. Collections

The Supplier acknowledges that (a) Silo will direct all payments made on any Purchased Receivable ("Collections") to Silo's Payment Account, in the ordinary course, and will have no obligation to pursue additional collection activities on Purchased Receivables, and (b) notification of the sale of the Purchased Receivables will generally not be provided to the Obligor of such Receivables of for administrative convenience, but Silo reserves the right to provide such notice in its sole discretion. The Supplier agrees that it will not otherwise modify, amend or deal in the Purchased Receivables in its capacity as Silo's servicer without Silo's prior written approval.

If the Obligor provides or otherwise makes available to the Supplier data or other information regarding the payment, (i) the Supplier will promptly deliver such information to Silo, or otherwise enable Silo to access such information directly from the Obligor, and (ii) the Supplier agrees that Silo may rely on such information in tracking Collections. To the extent that the Obligor does not provide or otherwise make available data or other information regarding amounts received in Silo's Payment Account, Silo will deem such amounts to be Collections.

The Supplier agrees to provide Silo with immediate notice in the event that the Supplier becomes aware of any grounds on which an Obligor may not make payment in full on account of any Purchased Receivable (e.g., disputes or close of business) as of the Maturity Date for such Purchased Receivable.

If the Supplier receives any Collections directly from an Obligor, the Supplier will direct such Collections in full to Silo's Payment Account.  The Supplier acknowledges that it has no legal title to such funds and agrees to hold the amount of such Collections in trust for the benefit of Silo until such funds are deposited in Silo's Payment Account.  Upon receipt of any Collections by the Supplier, the Supplier authorizes Silo to initiate an Automated Clearing House (ACH) or direct electronic funds transfer from any such account into which Collections are received and to take any other steps that may be necessary for Silo to receive the Collections.

## 6. Designated Account; Amounts Owed to Silo

The Supplier agrees to establish and maintain an account that the Supplier will designate in writing to Silo from time to time (the "Designated Account").  The Supplier hereby authorizes Silo to initiate an Automated Clearing House (ACH) or direct electronic funds transfer from the Designated Account for amounts owed by the Supplier to Silo under this Agreement, including, without limitation, Reduction Reserve Deficit and Transaction Fee payments payable on the Deferred Purchase Price Payment Date for each Purchased Receivable.

If Silo is unable to collect any such amounts owed under this Agreement from the Designated Account, you hereby authorize Silo to collect such amounts from any payment method that Silo has on file for you, including any account that is currently or was previously linked to the Silo platform. We may collect partial payments for unpaid amounts from any such payment method. Any collection of a partial payment is not a waiver of our rights and will not satisfy your obligation to pay in full. If we cannot collect these amounts via ACH or another method, you agree to immediately pay all amounts owed as directed.

We may exercise this right against Supplier, its affiliates, or any of their respective successors or assigns, or any assignees for the benefit of your creditors, trustees, or receivers of Supplier assets.

6

This right will exist even if we do not exercise it prior to the making, filing, or issuance of an arbitration demand, court order, or other action.

You also authorize Silo to collect any amounts owed under this Agreement from funds received from your other transactions on the Silo platform, regardless of whether such transactions relate to Purchased Receivables.

Any failure to (i) pay the full amount owed to Silo or (ii) cause Collections to be deposited in Silo's Payment Account when required is a breach of this Agreement. You are responsible for all costs or expenses that we incur in the process of collecting amounts owed but not timely paid, including legal or collections fees, and you are responsible for paying interest on such amounts at the maximum rate permitted under law.

## Late Fees

Unless otherwise agreed upon or set forth in the Purchase Terms, the Supplier agrees to pay Silo Late Fees (calculated as a percentage of the Net Face Value of the Receivable) in addition to the Transaction Fee if the amount owed to Silo is outstanding beyond the Maturity Date per the below schedule.

| Days after Maturity Date Payment is Received | Fees Assessed |
| --- | --- |
| 1 to 30 days after the Maturity Date | Transaction Fee + additional 0.5% |
| 30+ days after the Maturity Date | Transaction Fee + additional 1.5% |

## 7. Adjustments

If on any day following the Purchase Date of a Purchased Receivable an Obligor makes any reduction or adjustment to, or takes or retains any credit in respect of, the amount of a scheduled payout in respect of a Purchased Receivable (including any setoff, recoupment, or other fee or charge) (each, an "Adjustment"), the Supplier will be deemed to have received on such day a Collection in respect of that Purchased Receivable in the amount of Adjustment the and must pay the amount of that Adjustment to Silo.  This includes (a) Adjustments related to any claim of defective goods or services, (b) any discount or adjustment made by Supplier, (c) any disputes or claims regarding to the quality, price, or quantity of the goods or services related to the Purchased Receivables, or (d) any other claim by Obligor against Supplier relating to the Purchased Receivable (other than a claim that gives rise to a Repurchase Event).

The obligation to pay the amount of any such Adjustment will be set off against Silo's obligation to pay the Deferred Purchase Price and any excess after such setoff will be payable to Silo in accordance with the terms of Section 3 (*Deferred Purchase Price Mechanics*).

In the event of an Adjustment that is not associated with a specific Purchased Receivable (e.g. the establishment of a general reserve by the Obligor), you agree that in Silo's sole discretion the Adjustment amount may be deemed allocated to first reduce the amount of collections received by

Supplier with respect to Receivables that are not Purchased Receivables prior to application of such Adjustment amounts to the Purchased Receivables.

SUPPLIER WAIVES ANY REQUIREMENT THAT SILO INFORM SUPPLIER OF ANY ADJUSTMENT HEREUNDER. SILO'S FAILURE TO INFORM THE SUPPLIER OF ANY ADJUSTMENT HEREUNDER IS NOT A WAIVER BY SILO OF ANY RIGHT TO REQUIRE ANY PAYMENT OF THE AMOUNT OF SUCH ADJUSTMENT TO WHICH IT MAY BE ENTITLED UNDER THIS AGREEMENT.

## 8. Repurchases

As set forth in Section 3 (*Deferred Purchase Price Mechanics*), in case of a Repurchase Event, the Actual Reduction Amount with respect to any Purchased Receivable will be equal to any Repurchase Amount with respect to such Purchased Receivable. A "Repurchase Event" with respect to any Purchased Receivable will have occurred if (i) any representation or warranty made by Supplier in Section 12 with respect to such Purchased Receivable shall be inaccurate, incorrect or untrue on any date as of which it is made or deemed to be made; or (ii) Supplier confirms or issues a refund to the applicable Obligor for, or accepts a return of, the goods and/or services whose sale gave rise to such Purchased Receivable.

Upon the occurrence of a Repurchase Event, the Repurchase Amount will become due and payable by the Supplier within 5 business days.  The "Repurchase Amount" will be equal to the Purchase Price for such Purchased Receivable, net of (1) any Deferred Purchase Price for such Purchased Receivable that has not yet been paid to the Supplier and (2) any payments by the applicable Obligor with respect to such Purchased Receivable received by Silo.

Any Repurchase Amount will be included in the calculation of the Reduction Reserve Deficit for the applicable Purchased Receivable.  The amount of such Reduction Reserve Deficit will be payable to Silo in accordance with Section 3 (*Deferred Purchase Price Mechanics*).

## 9. No Obligation to Purchase or Sell

Silo has no obligation to purchase any Receivables from the Supplier, regardless of whether Silo has previously purchased Receivables under this Agreement, and regardless of whether the Supplier has accepted Purchase Terms w with respect to a certain Obligor.

With respect to any Transaction, we may, in our sole and absolute discretion, decline to purchase Receivables for any reason (including factors related to you, your account on the Silo platform, or the Receivables in question, or if we determine that such a Transaction would pose an unacceptable risk to Silo) or for no reason. We are not required to provide a reason if we decline to purchase Receivables or change our eligibility determination with respect to any Obligor.

You are not obligated to engage in any Transaction with us. If you choose to make Receivables with respect to a certain Obligor available to Silo for purchase, you will have the opportunity to opt out of offering any given Receivable to Silo by delivering a notice to Silo in accordance with the terms of Section 1 (*Purchase and Sale of Receivables*), stating that you do not wish to offer such Receivable for purchase. If you choose to enter into a Transaction, you acknowledge and agree that the applicable Purchase Price reflects the fair market value of the corresponding Purchased Receivable(s).

## 10. Relationship of Parties

The relationship of the parties is intended to be that of purchaser and seller of Receivables. Following any Transaction, Silo will have the absolute right to collect on Purchased Receivables, and may sell, factor, pledge, initiate collections, or settle any dispute relating to the Purchased Receivables in its sole discretion. Supplier will mark its books and records to show that it has sold the Purchased Receivables to Silo. You acknowledge that upon your receipt of the Purchase Price for any Transaction, subject to any rights we may exercise, you will have no right to reacquire the related Purchased Receivable or to otherwise receive any Collections with respect thereto.

## 11. Representations and Warranties Relating to the Supplier

By submitting an application to participate in the Silo Instant Pay Program or offering any Receivables for purchase hereunder, Supplier and the natural person taking such action each makes the following representations and warranties for itself or as an authorized representative of Supplier, as applicable. These representations and warranties are ongoing and will survive both each Purchase Date and the termination of this Agreement.

- Each of the representations and warranties by the Supplier contained in this Agreement is accurate and complete.
- The natural person requesting access to the Silo Instant Pay Program on the Supplier's behalf or offering any Receivables for purchase hereunder is authorized to bind the Supplier to this Agreement.
- Supplier is fully authorized to enter into this Agreement and to perform its obligations hereunder, and this Agreement constitutes a legal, valid, and binding obligation of the Supplier.
- Supplier and all of its employees, contractors, and agents have all licenses, registrations, and authorizations required to conduct its and their businesses
- Supplier will use all funds that it may receive as a result of its participation in the Silo Instant Pay Program solely for commercial purposes in connection with Supplier's business and not for personal, family, or household use.
- All information provided by Supplier to Silo, including information related to Supplier's business and the Receivables, is true and correct. There is no fact or circumstance that could adversely affect the business, assets, or financial condition of Supplier or an Obligor, any of the Receivables, the Supplier's ability to perform its obligations under this Agreement, or the accuracy and completeness of the Supplier's representations and warranties, that has not been disclosed in writing.
- This Agreement and the performance of Supplier's obligations hereunder does not violate the terms of any of Supplier's agreements with the Obligors with respect to Purchased Receivables.
- There are no financing statements now or soon to be on file in any public office relating to any Receivables in which Supplier is named or has signed as the debtor, except the financing statements filed or which may be filed in respect of this Agreement.
- Supplier is not an affiliate, agent, or contractor of any Obligor with respect to Purchased Receivables, nor are any of the Supplier's employees, officers, or directors in any way related to any Obligors with respect to Purchased Receivables.
- Supplier is solvent and has the ability to pay Supplier's debts as they become due. Supplier is not entering into any Transaction with the intention to hinder or impair any creditor of Supplier.

9

- Supplier has, or will have by the Purchase Date, designated Silo's Payment Account as the sole account for payment by Obligors on Purchased Receivables.
- Supplier has not entered into any financing transaction with an Obligor or any other third party based on Supplier's transactions through Silo.

## 12. Representations and Warranties Relating to the Receivables

For each Purchased Receivable, Supplier makes the following representations and warranties to Silo as of the time of purchase:

- Supplier has legal title to the Receivable and is authorized to sell the Receivable to Silo.
- The amount of each Purchased Receivable as reflected in the Transaction Details is due and owing to Supplier and represents an accurate statement of a *bona fide* sale, delivery, and acceptance of goods or services by Supplier to or for a customer of Supplier in the ordinary course of the Supplier's business. The delivery of goods or services giving rise to each such Purchased Receivable do not violate any applicable law, regulation, or contractual covenant binding upon Supplier.
- The delivery of goods or services giving rise to each such Purchased Receivable does not relate to any of the following businesses, services, or industries:
    - guns and firearms manufacturing;
    - conflict minerals (as defined by the United States Securities and Exchange Commission), deep sea drilling, owning or operating oil tankers, underground mining, transport of crude (persistent oil) or uranium, coal fired power generation, nuclear power generation, large-scale hydro power generation, new oil sands exploration, new mining of coal, mountaintop removal mining, illegal logging, logging utilizing uncontrolled fire;
    - pornography, adult entertainment, prostitution and/or escort services;
    - payday lending, or any other business that utilizes predatory lending practices in its business (even if not the primary component of such business);
    - gambling, betting, lotteries, sweepstakes or games of chance;
    - cryptocurrency;
    - cannabis;
    - animal testing;
    - sale of counterfeit or "gray market" goods and services; or
    - sale of controlled substances without the proper pharmaceutical license.
- Each Purchased Receivable is free and clear of any and all liens, charges, attachments, or security interests (except with respect to any such Liens on behalf of Silo or its affiliates) and is free of, and will be paid to us without, defenses, disputes, offsets, counterclaims, or rights of return or cancellation.
- There is no current dispute between the Supplier and any Purchased Receivables Obligor, and Supplier has no reason to believe there will be a dispute.
- Supplier has not transferred, assigned, or pledged such Receivable and has not granted a security interest therein to any party other than Silo.
- Supplier has not and does not have any dispute with a Purchased Receivables Obligor (or with any other online marketplace or selling platform through which the Supplier sells goods or services) related to or alleging fraudulent behavior by Supplier.

## 13. Covenants

During the term of this Agreement, including any period in which any amounts are owed to Silo by the Supplier or the Obligors of Purchased Receivables, the Supplier will:

- treat Silo's purchase of any Purchased Receivables hereunder as a sale for tax, accounting, and financial reporting purposes, and Supplier's books and records will reflect the sale of the Purchased Receivables to Silo;
- maintain its Designated Account in good standing and promptly pay any amounts owed to Silo;
- timely pay all federal, state and local taxes and provide written proof thereof to Silo upon request;
- comply with all relevant laws and regulations applicable to this Agreement, the Receivables, and all related transactions;
- take all steps to enable—and will not at any time disable—any and all payment functionality to ensure that all Collections are automatically paid to Silo's Payment Account.
- direct all Obligors to make payments on account of Purchased Receivables into Silo's Payment Account;
- timely and professionally deliver all goods and perform all services related to the Purchased Receivables with a level of quality commensurate with customer expectations and applicable industry standards, and provide evidence of such performance if requested by Silo;
- notify Silo in writing immediately after obtaining knowledge from any source of the filing of any lien, claim, levy, or other legal action against any property of Supplier or an Obligor of a Purchased Receivables;
- notify Silo immediately of any payment received by the Supplier on any Purchased Receivable and remit the amount of such payment to Silo within one (1) Business Day of receipt; and,
- take all actions reasonably requested by Silo to preserve and protect Silo's right, title, and interest in and to any Purchased Receivables.

During the term of this Agreement, including any period in which any amounts are owed to Silo by the Supplier or the Purchased Receivables Obligors, Supplier will not, without prior written permission from Silo, attempt or purport to:

- grant allowances or credit to any Obligor of a Purchased Receivable without prior written approval of Silo.
- take any measure to interfere with the ability of Silo to collect amounts owed to it in respect of Purchased Receivables;
- conduct its business under another name, registered business address, type of entity or jurisdiction of organization except as disclosed to Silo with a minimum of thirty (30) days' prior written notice;
- transfer, assign, or dispose of any part of its business or interest in the Purchased Receivables other than to Silo under this Agreement;
- grant any extension of time for payment of any of any Purchased Receivable;
- compromise or settle any Purchased Receivable for less than the full amount thereof;
- release in whole or in part any Obligor with respect to a Purchased Receivable or other person liable for the payment of any Purchased Receivable;
- grant any credits, discounts, allowances, deductions, return authorizations, or the like with respect to any Purchased Receivable;
- create, incur, assume, or permit to exist any lien upon or with respect to any Receivable now owned or hereafter acquired by Supplier;

11

- interfere with the rights of Silo or its affiliates under this Agreement;
- take any action that violates the terms of use of the Silo platform;
- execute nor permit the recording of any financing statements in favor of any other person or entity, except Silo or an affiliate of Silo, during the term of this Agreement;
- withdraw any Collections from the account to which the Obligor deposits them other than to remit such amounts to Silo or otherwise at the express direction of Silo;
- violate any of its agreements with an Obligor or any policy of any Obligor;
- take any action that may materially impair the value of the Purchased Receivables or cause a material dispute with any Obligor with respect to Purchased Receivables; or
- take any action that would result in an Adjustment other than Adjustments occurring in the normal course of business.

## 14. Indemnification

Supplier agrees to indemnify, defend, and hold Silo harmless against any Losses incurred by Silo arising out of or relating to a breach by Supplier of any of Supplier's representations, warranties, covenants, or agreements contained in this Agreement.

## 15. Authorization to Debit Linked Accounts; ACH Authorization

THIS SECTION PROVIDES AUTHORIZATION TO AUTOMATICALLY DEBIT YOUR CURRENT AND PREVIOUSLY LINKED or IDENTIFIED ACCOUNTS FOR ALL AMOUNTS YOU OWE UNDER THIS AGREEMENT. PLEASE READ IT THOROUGHLY.

You authorize Silo and its successors and assigns to collect amounts owed under this Agreement by debiting funds from the Designated Account or any other account that you've linked to the Silo platform ("Linked Accounts"). If we use the Automated Clearinghouse (ACH) network, the debits will be governed by the rules established by the National Automated Clearinghouse Association (NACHA) for business-related ACH debits. You also authorize Silo to debit your Linked Accounts for verification purposes (through microdeposits or similar means).

In the event that we make an error in processing an electronic debit, you authorize us to correct the error by initiating an electronic credit or debit to the Linked Account in the amount of such error on or after the date such error occurs.

*This authorization includes the authorization to collect immediately for any amounts described in Section 6 (Designated Account; Amounts Owed to Silo).*

## 16. Withdrawing Your Authorization

To withdraw the debit authorization from a Linked Account, you must provide Silo 30 days' notice and pay all amounts owed under this Agreement immediately, including charges, fees, fines, and other amounts. Please note that revoking the authorization of your Designated Account as a Linked Account will not take effect until all outstanding obligations have been paid in full, and will mean that you may no longer be eligible for future Transactions under this Agreement even if you have paid all of your obligations.

Withdrawal of a debit authorization does not terminate your obligation to pay all amounts owed under this Agreement. Supplier will be responsible for all costs of collections and damages if amounts owed are not paid in full by Supplier.

12

## 17. Security Interest in Purchased Receivables

The parties hereto agree that each purchase and sale of Receivables under this Agreement is intended to be an absolute and irrevocable transfer constituting a "true sale" for bankruptcy law purposes, without recourse by Silo to Supplier for any credit risk or financial inability to pay of any Obligor. The parties hereto have structured the transactions contemplated by this Agreement as a sale, and each party hereto agrees to treat each such transaction as a "true sale" for all purposes under applicable law and accounting principles, including, without limitation, in their respective books, records, computer files, tax returns (federal, state and local), regulatory and governmental filings (and shall reflect such sale in their respective financial statements). Supplier will advise all persons inquiring about the ownership of the Receivables that all Purchased Receivables have been sold to Silo. Against the possibility that, contrary to the mutual intent of the parties, the purchase of any Purchased Receivable is not characterized as a sale by any applicable court, Supplier hereby grants to Silo a security interest in, and right of setoff with respect to, all of the Purchased Receivables and all proceeds thereof to secure the payment and performance of Supplier's payment and performance obligations hereunder. The grant of each security interest herein is a supplemental protection to Silo and is not meant to negate or affect in any way the intended sale of the Purchased Receivables by Supplier to Silo and the fact that the parties intend for the Purchased Receivables to be assets of Silo. Silo is hereby authorized to file UCC financing statements with respect to the transactions contemplated hereunder, including the security interests granted herein, together with any continuations and amendments relating thereto.

## 18. Default

Each of the following events will constitute an "Event of Default":

- Supplier fails to pay any obligation due to Silo under this Agreement, including in respect of Adjustments or Repurchase Amounts, or takes any action to interfere with the ability of Silo to collect obligations owed to it hereunder;
- Any representation or warranty is materially false;
- Supplier materially defaults on its obligations to any Obligor of Purchased Receivables or any third party that is required to make payments in respect of the Purchased Receivables or which may be otherwise due hereunder;
- Supplier (i) directs an Obligor to make payment on account of a Purchased Receivable to an account other than Silo's Payment Account or (ii) fails to direct an Obligor to make payment on account of all Purchased Receivables into Silo's Payment Account;
- Supplier changes the Obligor payment account to an account other than Silo's Payment Account or other permitted account during while a Purchased Receivable with respect to that Obligor remains outstanding;
- Supplier breaches, or defaults in the performance of, any provision or obligation of its agreements with the Obligor;
- Supplier breaches, or defaults in the performance of, any material provision or obligation of any other Agreement between Supplier and Silo;
- Supplier defaults on an obligation to Obligor, or Supplier's agreement with any Obligor is terminated or materially impaired;
- Silo determines based on its own information or information from third-party sources that the quality or promptness of goods or services provided by Supplier to Obligors of Purchased Receivables does not meet applicable industry standards or customer expectations;

13

- Supplier becomes subject of any suit, action, or proceeding alleging misappropriation or infringement of any patent, trademark, trade dress, trade secret, copyright or other right relating to goods or services delivered in respect of any Receivables, or any other violation of applicable law, rule, or regulation;
- Supplier or any Obligor of Purchased Receivables becomes subject to any debtor-relief proceedings;
- Supplier is dissolved; becomes insolvent on a balance sheet basis; becomes unable to pay its debts as they become due; files bankruptcy voluntarily or is the subject of a petition for involuntary bankruptcy; is the subject of an assignment for the benefit of creditors; receivership, execution, or similar action by creditors; or has a material judgment entered against it;
- Any person attempts to seize, or purports to create any lien or other security interest in, the Purchased Receivables without the written consent of Silo; or
- Silo determines, in its sole discretion, that Supplier has violated any applicable law, rule or regulation, or that Supplier is engaging in fraudulent activity, in accordance with Silo's internal requirements, models or policies then in effect.

Upon the occurrence of any Event of Default, in addition to any rights Silo has under or applicable law, including any rights Silo has to immediately enforce remedies to recover amounts due to Silo under this Agreement, Silo may immediately terminate this Agreement.

## 19. Term and Termination

Please contact Silo if you wish to discontinue your participation in the Silo Instant Pay Program or terminate this Agreement. You may at any time cease offering Receivables to Silo by providing Silo with (10) Business Days' notice, but you may not terminate this Agreement if any amounts are owed to Silo by you or any Obligor with respect to Purchased Receivables.

Silo may terminate this Agreement and your participation in the Silo Instant Pay Program as described herein, if there is an Event of Default, or if Silo determines, in our sole discretion, that your continued participation in the Silo Instant Pay Program poses an unacceptable risk to Silo. Any termination will not affect in any way Silo's rights with respect to transactions that occurred before such termination.

## 20. Waiver of Automatic Stay

IF SUPPLIER BECOMES A DEBTOR UNDER ANY CHAPTER OF THE UNITED STATES BANKRUPTCY CODE, TITLE 11, U.S.C., OR UNDER ANY COMPARABLE LAW, SUPPLIER HEREBY AGREES AND WAIVES THE BENEFITS OF THE AUTOMATIC STAY (OF 11 U.S.C. §362 OR UNDER COMPARABLE LAW) TO THE MAXIMUM EXTENT ALLOWED BY APPLICABLE LAW. Supplier agrees that it will not raise any defense to a motion for relief from the automatic stay brought by Silo or any successor or assignee thereof in reliance on this waiver. Supplier has consulted with counsel of its choice before agreeing to this waiver.

## 21. Notices

Except as otherwise expressly provided herein, all notices, approvals, consents and other communications required or permitted under this Agreement will be invalid unless made in writing

14

and given (a) by Silo via mail, fax or e-mail (to the address or number you provide) or (b) by you via email to silopay@usesilo.com.  Silo will use the e-mail address, postal mail address, and/or fax number that you provide.  It is your responsibility to promptly update us with e-mail address, postal mail address, and phone number changes.  Communications sent to an e-mail address, postal mail address, or fax number that you have changed will be considered received when sent by us to the address or fax number we have on file.

## 22. Taxes

Supplier shall pay, and indemnify and hold Silo harmless from and against any taxes that may at any time be asserted in respect of the purchase transactions hereunder (including any sales, occupational, excise, gross receipts, personal property, privilege or license taxes, stamp duties or any withholdings ("Taxes"), but not including taxes imposed upon Silo with respect to its overall net income) and costs, expenses and reasonable counsel fees in defending against the same, whether arising by reason of the acts to be performed by Supplier hereunder or otherwise. If Supplier or the applicable Obligor shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder (i) the sum payable shall be increased as may be necessary so that, after making all required deductions (including deductions applicable to additional sums payable under this paragraph), Silo receives an amount equal to the sum it would have received had no such deductions been made, (ii) Supplier shall make such deductions (unless the Obligor has made such deductions) and (iii) Supplier shall pay (unless the Obligor shall have paid) the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

## 23. Survival

All covenants made herein shall continue in full force and effect so long as any Purchased Receivable remains outstanding.  All indemnity obligations and all limitation of liability provisions contained in this Agreement shall survive and remain in full force and effect notwithstanding termination of this Agreement.

## 24. Governing Law

THIS AGREEMENT IS GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA AND THE OBLIGATIONS, RIGHTS, AND REMEDIES OF THE PARTIES WILL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS WITHOUT REGARD TO ITS CONFLICT OF LAWS PROVISIONS.

## 25. Counterparts; Electronic Signatures

This Agreement shall be valid, binding, and enforceable against a party only when executed and delivered by an authorized individual on behalf of the party by means of (i) any electronic signature permitted by the federal Electronic Signatures in Global and National Commerce Act, state enactments of the Uniform Electronic Transactions Act, and/or any other relevant electronic signatures law; (ii) an original manual signature; or (iii) a faxed, scanned, or photocopied manual signature.  Each electronic signature or faxed, scanned, or photocopied manual signature shall for all purposes have the same validity, legal effect, and admissibility in evidence as an original manual signature.  Each party hereto shall be entitled to conclusively rely upon, and shall have no liability with respect to, any faxed, scanned, or photocopied manual signature, or other electronic signature,

of any party and shall have no duty to investigate, confirm or otherwise verify the validity or authenticity thereof. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall, together, constitute one and the same instrument.

## 26. Miscellaneous

Supplier may not assign this Agreement without Silo's advance written consent, and any such assignment or attempted assignment by Supplier without Silo's advance written consent is and will be null and void. Silo may assign this Agreement without Supplier's consent. The provisions of this Agreement will insure to the benefit of, and be binding upon, the parties and their respective successors and permitted assigns. There are no third-party beneficiaries of this Agreement. This Agreement constitutes the entire agreement between the parties and supersedes all prior agreements and understandings, both written and oral, with respect to the subject matter of this Agreement, and if any provision of this Agreement is found to be invalid or unenforceable, all other provisions will be enforced and construed as if the invalid provision were never a part of this Agreement. The failure to enforce any provision of this Agreement will not be considered a waiver. Neither Party shall be liable for failure to perform or for delay in performance due to fire, flood, strike, or other labor difficulty, act of God, act of any governmental authority, riot, embargo, fuel or energy shortage, wrecks or delays in transportation, inability to obtain necessary labor, or materials from usual sources, or due to any cause beyond either Party's reasonable control ("Force Majeure Event"). In the event of a delay in performance due to any such Force Majeure Event, the date of delivery or time for completion of performance will be extended by a period of time equal to the delay. Notwithstanding the above, no Force Majeure Event shall relieve Supplier of its timely repayment obligations herein. The word "will" shall be construed to have the same meaning and effect as the word "shall." The words "include" and "including" mean without limitation by reason of enumeration.

## 27. Definitions

"Adjustment" means, with respect to any Receivable, any discount, adjustment, deduction, or reduction that would have the effect of reducing the final amount of part or all of such Receivable (except, in each case, to the extent resulting solely from an Insolvency Event of the applicable Obligor or the financial inability of the Obligor to pay such Receivable).

"Business Day" means a day that is not a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to remain closed.

"Designated Account" means the Supplier's account as identified in writing to Silo from time to time by Supplier.

"Maturity Date" means, with respect to any Receivable, the date on which such Receivable becomes due and payable as set forth in the applicable invoice.

"Obligor" means, with respect to any Receivable, the person that is obligated to make payments in respect of such Receivable (including any guarantor).

"Purchased Receivable" means a Receivable purchased by Silo in accordance with the terms and conditions hereof; *provided* that a Receivable purchased hereunder and subsequently

repurchased by Supplier pursuant to the terms and conditions hereof shall, upon receipt by Silo of the Repurchase Amount therefor, cease to be a Purchased Receivable.

"<u>Receivable</u>" means Supplier's rights to receive payment from an Obligor (or any affiliate thereof that has undertaken to make payment) in respect of a bona fide obligation of the Obligor arising out of Supplier's sale and delivery of goods and/or services, in each case as evidenced by an invoice (or similar documents).

"<u>Settlement Date</u>" means a recurring Date as set forth in the applicable Purchase Terms.

"<u>Silo's Payment Account</u>" means the account that Silo has designated to receive payments on account of Purchased Receivables.

"<u>Silo Instant Pay Program</u>" means the program governed by this Agreement through which Silo and the Supplier enter into one or more Transactions for the purchase and sale of Receivables.

"<u>Transaction</u>" means each purchase and sale of Receivables under this Agreement.

17

# Exhibit C

<em>Execution Version</em>

# FORBEARANCE AGREEMENT

This **FORBEARANCE AGREEMENT** (this "**Agreement**") dated as of June 19, 2024, is entered into by and among **DASAGROUP HOLDINGS CORP. (D/B/A KICKHASS AVOCADOS)**, a Delaware corporation ("**Kickhass**"), **SILO TECHNOLOGIES INC.**, a Delaware corporation ("**Silo**") and **JEFFERIES FUNDING LLC** ("**Jefferies**"). Capitalized terms not otherwise defined in this Agreement have the same meanings as specified in that certain Supplier Receivables Sales Agreement, originally effective on or about June 6, 2022, by and between Silo and Kickhass (as amended, restated or modified from time to time, including by this Agreement, the "**Sales Agreement**").

**RECITALS:**

**WHEREAS**, pursuant to the Sales Agreement, Kickhass agreed to offer certain Receivables for sale to Silo and Silo purchased such Receivables from time to time from Kickhass on the terms and subject to the conditions therein;

**WHEREAS**, Jefferies alleges that Kickhass, through certain of its officers and employees, has informed Silo that, with respect to certain Receivables sold by Kickhass to Silo identified on Exhibit A attached hereto (such Receivables, the "**Affected Receivables**"), payments from the Obligors with respect to such Affected Receivables have not been timely made to Silo, but have instead been made to deposit accounts other than Silo's Payment Account, which is a violation of Section 5 of the Sales Agreement and an Event of Default under Section 18 of the Sales Agreement (the "**Existing Events of Default**");

**WHEREAS**, Kickhass disputes any alleged Existing Events of Default;

**WHEREAS**, as of the date hereof, the total amount of payments with respect to the Affected Receivables that have not been timely made to Silo's Payment Account is equal to approximately $3,076,444.56 (such amount, the "**Existing Payment Deficiency**");

**WHEREAS**, as a result of the Existing Events of Default and the Existing Payment Deficiency, Silo has the present right to exercise all of its rights and remedies under the Sales Agreement, including, without limitation, all of Silo's rights under applicable law and the right to terminate the Sales Agreement immediately;

**WHEREAS**, Silo has pledged all of its right, title and interest in and to the Sales Agreement and the Purchased Receivables purchased by it thereunder (including, without limitation, the Affected Receivables), and all products and proceeds thereof to Jefferies to secure certain indebtedness owed by Silo to Jefferies and, as a result, Jefferies is a third party beneficiary of all of the rights of Silo under the Sales Agreement and the Purchased Receivables (including, without limitation, the Affected Receivables);

**WHEREAS**, Kickhass has requested that Silo and Jefferies, for the period (the "**Forbearance Period**") commencing as of the date that the conditions precedent set forth in Section 3 below are satisfied in the sole discretion of Silo and Jefferies and ending on the earliest of (*x*) the occurrence of a Forbearance Default (defined below), (*y*) the repayment in full of the Existing Payment Deficiency in cash and (*z*) 5:00 p.m. (New York time) on September 18, 2024

(the date upon which the earliest of the events described in <u>clauses (x)</u>, <u>(y)</u> and <u>(z)</u> occurs, the "**Forbearance Expiration Date**"), forbear from exercising their respective rights and remedies against Kickhass (but, for the avoidance of doubt, not against the Obligors) under the Sales Agreement and the Purchased Receivables (including, without limitation, the Affected Receivables) with respect to the Existing Events of Default and the Existing Payment Deficiency;

**WHEREAS**, Silo and Jefferies are willing, pursuant to the terms and conditions set forth herein, during the Forbearance Period, to forbear from exercising their rights and remedies against Kickhass (but, for the avoidance of doubt, not against the Obligors) under the Sales Agreement and the Purchased Receivables (including, without limitation, the Affected Receivables) with respect to the Existing Events of Default or the Existing Payment Deficiency, subject to the terms and conditions herein.

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

**SECTION 1.  AGREEMENT TO FORBEAR**

1.1     Subject to the satisfaction of the conditions precedent set forth in <u>Section 3</u> below and the terms and conditions as hereinafter set forth in this <u>Section 1</u> and elsewhere in this Agreement, during the Forbearance Period, Silo and Jefferies each hereby agree that they will forbear from exercising their respective rights and remedies against Kickhass (but, for the avoidance of doubt, not against the Obligors) under the Sales Agreement and the other Facility Documents relating to the Existing Events of Default. Notwithstanding any provision of this Agreement, nothing contained herein shall limit any rights or remedies under the Sales Agreement based on any Default or any Event of Default which is not an Existing Event of Default (a "**Additional Event of Default**"), <u>provided</u>, that, the continuation of the Existing Events of Default during the Forbearance Period shall not be considered an Additional Event of Default.

1.2     Silo and Jefferies' agreement to grant the forbearance with respect to the Existing Events of Default referenced in <u>clause (a)</u> above is given solely to the extent that the information disclosed to Silo and Jefferies by Kickhass in requesting the forbearance accurately reflects the reasons given therefore.

1.3     For the avoidance of doubt, if (i) either Silo or Jefferies determines in its reasonable, good faith judgment that the nature or extent of the Existing Events of Default are materially different from the nature or extent as disclosed to Silo or Jefferies in writing prior to the date hereof, or (ii) any Forbearance Default occurs then, upon written notice by either Silo or Jefferies to Kickhass, the forbearance, waivers, and consents set forth in this <u>Section 1</u> shall terminate immediately and be rescinded automatically without further action by Silo or Jefferies, and Silo and Jefferies shall have the right to exercise any and all of their rights and remedies in accordance with the terms of the Sales Agreement with respect to any Default or Event of Default (including without limitation the Existing Events of Default) related thereto immediately and without any further passage of time.

1.4     Upon the Forbearance Expiration Date, Silo and Jefferies' forbearance and any waiver set forth in this <u>Section 1</u> shall automatically terminate and each of Silo and Jefferies shall

be entitled to exercise any and all of its rights and remedies under this Agreement or the Sales Agreement without further notice.

1.5 <u>No Consent or Waiver</u>. Except as expressly provided herein (a) nothing contained in this Agreement, or any other communication between Silo or Jefferies, on the one hand, and Kickhass, on the other hand, shall be construed as a waiver by either Silo, Jefferies, or Kickhass of any covenant or provision of the Sales Agreement, the Purchased Receivables, this Agreement, of any other contract or instrument among Kickhass, Silo or Jefferies, or of any similar future transaction and the failure of Silo, Jefferies, or Kickhass at any time or times hereafter to require strict performance by Silo, Jefferies, or Kickhass of any provision thereof shall not waive, affect, or diminish any right of Silo, Jefferies, or Kickhass to thereafter demand strict compliance therewith, and (b) nothing contained in this Agreement shall directly or indirectly in any way whatsoever: (i) impair, prejudice or otherwise adversely affect Silo, Jefferies', or Kickhass' right at any time to exercise any right, privilege or remedy in connection with the Sales Agreement or the Purchased Receivables, (ii) amend, modify, or alter any provision of the Sales Agreement or any Purchased Receivables or any other contract or instrument, or (iii) constitute any course of dealings or other basis for altering any obligation of Kickhass or Silo under the Sales Agreement or any Purchased Receivable or any right, privilege or remedy of Silo, Jefferies, or Kickhass under the Sales Agreement, any Purchased Receivable or any other contract or instrument. Except as expressly provided herein, Silo, Jefferies, and Kickhass each hereby reserves all rights granted under the Sales Agreement, each Purchased Receivable, this Agreement, and any other contract or instrument among Kickhass, Silo and/or Jefferies.

## SECTION 2.   REPRESENTATIONS AND WARRANTIES

In order to induce Silo and Jefferies to enter into this Agreement, Kickhass represents and warrants to Silo and Jefferies, on the Forbearance Effective Date, that the following statements are true and correct, it being understood and agreed that the representations and warranties made on the Forbearance Effective Date are deemed to be made concurrently with the consummation of the transactions contemplated hereby:

**2.1    Due Authorization.** The execution, delivery and performance of this Agreement have been duly authorized by all necessary action on the part of Kickhass.

**2.2    Binding Obligation.** This Agreement has been duly executed and delivered by Kickhass and is the legally valid and binding obligation of Kickhass enforceable against Kickhass in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

**2.3    Incorporation of Representations and Warranties from Sales Agreement**. The representations and warranties of Kickhass contained in the Sales Agreement are true and correct in all material respects on and as of the Forbearance Effective Date as though made on and as of that date, except as any thereof may be affected by the Existing Events of Default and except to the extent such representations and warranties specifically relate to an earlier date, in which case they were true and correct in all material respects on and as of such earlier date; <u>provided</u> that, in each case, such materiality qualifier shall not be applicable to any

representations and warranties that already are qualified or modified by materiality in the text thereof. No investigation by Silo or Jefferies or any closing shall affect the representations and warranties or the right of Silo or Jefferies to rely upon them.

2.4 **Outstanding Existing Payment Deficiency**. Under a full reservation of rights and for purposes of this Forbearance Agreement, Kickhass acknowledges that the total amount of the Existing Payment Deficiency as of the date hereof is $3,076,444.56.

2.5 **Superiority of Liens**. Kickhass further acknowledges and agrees that the Liens on the Purchased Receivables in favor of Silo granted under Section 17 of the Sales Agreement are valid, subsisting, perfected and enforceable liens and are superior to all liens.

2.6 **No Other Defaults**. To the best of Kickhass' knowledge, following a reasonable investigation, other than the alleged Existing Events of Default, no Event of Default exists under the Sales Agreement and Kickhass is in compliance in all material respects with all covenants and agreements contained therein.

2.7 **Affected Receivables**. Neither Kickhass nor any of its current or former directors, officers, shareholders, members, managers, partners, agents or employees, (a) prior to the date that disclosure was first made to Silo or Jefferies with respect to the Affected Receivables as described in the recitals hereto, (i) was aware of or (ii) had any knowledge of, or (b) at any time, (i) cooperated with, (ii) participated in, or (iii) concealed, in each case, any fraudulent conduct or intentional misrepresentation with respect to any Affected Receivables or any of the applicable Obligors related to such Affected Receivables.

## SECTION 3. CONDITIONS PRECEDENT

3.1 **Conditions Precedent to Effectiveness of the Amendment**. The Amendment provided for hereby shall become effective as of the date (the "**Forbearance Effective Date**") on which each of the following conditions have been satisfied or waived by Silo and Jefferies:

(a) <u>Agreement</u>. Silo and Jefferies shall have received fully executed counterparts of this Agreement;

(b) <u>Accuracy of Representations</u>. The representations and warranties made by Kickhass contained herein and in the Sales Agreement shall be true and correct in all material respects (except for representations and warranties already expressly qualified by materiality or material adverse effect, which representations and warranties shall be required to be true and correct without any further qualification of materiality) on and as the Forbearance Effective Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date.

(c) <u>No Default</u>. Other than the Existing Events of Default, no event has occurred and is continuing, or would immediately result from the effectiveness of this Agreement that would constitute an Event of Default or a Default.

## SECTION 4.  ADDITIONAL FORBEARANCE COVENANTS

As consideration for the agreements of each of the parties set forth herein, each of Kickhass, Silo and Jefferies hereby agree that:

**4.1    Collections on Receivables.**  On and after the date hereof, Kickhass shall cause all payments of Collections with respect to Purchased Receivables (including, without limitation, the Affected Receivables) to be deposited directly into the Jefferies Payment Account.  To the extent that, notwithstanding the foregoing, Kickhass collects any payment of Collections through any means other than a deposit directly into the Jefferies Payment Account, Kickhass will immediately (and in no event later than the two (2) business days following receipt) deposit such Collections directly into the Jefferies Payment Account.  At any time, at its discretion, Kickhass shall be permitted to deposit any other amounts, whether or not such amounts are the proceeds of any Purchased Receivables, into the Jefferies Payment Account.  Silo and Jefferies each agree that each payment received into the Jefferies Payment Account will be applied to reduce the outstanding balance of the Existing Payment Deficiency.  The Existing Payment Deficiency is required to be paid in full no later than September 18, 2024.

**4.2    Communications with Obligors.**  On and after the date hereof, (i) all communications with the Obligors with respect to payments with respect to the Purchased Receivables shall be coordinated by Silo and such third parties as Silo may engage (which shall include Carmel Solutions LLC) and (ii) Kickhass shall not communicate directly with such Obligors to modify any payment directions or otherwise specifically regarding such payments without the express consent of Silo and Jefferies, but Kickhass may otherwise communicate with Obligors in the ordinary course of business without the express written consent of Silo and Jefferies.

**4.3    Payment Milestones.**  Kickhass shall make payments into the Jefferies Payment Account in the amounts set forth below, on or before the date set forth for each payment in the table below (each, a "**Forbearance Milestone**"):

| | Payment | Deadline |
|---|---|---|
| 1. | An aggregate amount (after taking into account all payments made to the Jefferies Payment Account from time to time) equal to or greater than $150,000 since the Forbearance Effective Date | June 20, 2024 |
| 2. | An aggregate amount (after taking into account all payments made to the Jefferies Payment Account from time to time) equal to or greater than $300,000 since the Forbearance Effective Date | June 27, 2024 |
| 3. | An aggregate amount (after taking into account all payments made to the Jefferies Payment Account from | July 3, 2024 |

| | time to time) equal to or greater than $450,000 since the Forbearance Effective Date | |
|---|---|---|
| 4. | An aggregate amount (after taking into account all payments made to the Jefferies Payment Account from time to time) equal to or greater than $,600,000 since the Forbearance Effective Date | July 10, 2024 |
| 5. | An aggregate amount (after taking into account all payments made to the Jefferies Payment Account from time to time) equal to or greater than $,850,000 since the Forbearance Effective Date | July 17, 2024 |
| 6. | An aggregate amount (after taking into account all payments made to the Jefferies Payment Account from time to time) equal to or greater than $1,100,000 since the Forbearance Effective Date | July 24, 2024 |
| 7. | An aggregate amount (after taking into account all payments made to the Jefferies Payment Account from time to time) equal to or greater than $1,350,000 since the Forbearance Effective Date | July 31, 2024 |
| 8. | An aggregate amount (after taking into account all payments made to the Jefferies Payment Account from time to time) equal to or greater than $1,600,000 since the Forbearance Effective Date | August 7, 2024 |
| 9. | An aggregate amount (after taking into account all payments made to the Jefferies Payment Account from time to time) equal to or greater than $1,850,000 since the Forbearance Effective Date | August 14, 2024 |
| 10. | An aggregate amount (after taking into account all payments made to the Jefferies Payment Account from time to time) equal to or greater than $2,100,000 since the Forbearance Effective Date | August 21, 2024 |
| 11. | An aggregate amount (after taking into account all payments made to the Jefferies Payment Account from time to time) equal to or greater than $2,350,000 since the Forbearance Effective Date | August 28, 2024 |
| 12. | An aggregate amount (after taking into account all payments made to the Jefferies Payment Account from | September 4, 2024 |

| | time to time) equal to or greater than $2,600,000 since the Forbearance Effective Date | |
|---|---|---|
| 13 | An aggregate amount (after taking into account all payments made to the Jefferies Payment Account from time to time) equal to or greater than $2,850,000 since the Forbearance Effective Date | September 11, 2024 |
| 14 | An aggregate amount (after taking into account all payments made to the Jefferies Payment Account from time to time) equal to or greater than $3,076,444.56 since the Forbearance Effective Date | September 18, 2024 |

Silo and Jefferies hereby agree that, for any calendar week in which Kickhass has made all payments required to be made pursuant to this <u>Section 4.3</u>, any Late Fee (as calculated pursuant to Section 6 of the Sale Agreement) that would otherwise have accrued and become payable for such calendar week shall be waived by Silo, <u>provided</u>, that with respect to any calendar month in which Kickhass has not made all payments required to be made pursuant to this <u>Section 4.3</u>, all Late Fees with respect to such calendar week shall accrue and become payable as of the last day of such calendar month.

Kickhass hereby agrees that, on the last calendar day of each month, as a replacement for the financing charges that would otherwise be paid pursuant to the Sale Agreement, a financing charge of 3.0% of the portion of the Existing Payment Deficiency that has not been repaid to Jefferies (such charge, the "**Financing Charge**") shall be due and payable by Kickhass to Jefferies, <u>provided</u>, that to the extent that the Existing Payment Deficiency is paid in full in cash to Jefferies by Kickhass on or prior to  September 4, 2024, Jefferies agrees to provide a credit to Kickhass of all Financing Charges paid prior to the date of such payment in full against the total amount required to be repaid hereunder.  The Financing Charge is currently estimated to be $155,953.33. Accordingly, the payment due on September 18, 2024 is estimated to be $216,148.06 (that is, $372,101.39 minus $155,953.33 equals $216,148.06).

    **4.4**    **Informational Rights.**  Kickhass hereby agrees to provide to Silo and Jefferies any information regarding the Sales Agreement, the Affected Receivables, its Obligors, or any other reasonably related documents as may be requested by Silo or Jefferies from time to time, including, without limitation, (a) bank statements for all financial institutions though which Kickhass received payment from any Obligors or through which Kickhass processes payments from any Obligors, (b) details regarding any claw-back or other off-set rights that Kickhass has against its vendors and (c) details of all of Kickhass' Receivables (whether or not such Receivables were Purchased Receivables or Affected Receivables) including, without limitation, (x) all Receivables originated since March 29, 2024 (which information shall include the amount, the Obligor name and the date of payment (if any)) and (y) all outstanding Receivables (whenever originated) (which information shall include the amount, the Obligor name and the invoice due date).

    **4.5**    **Forbearance Defaults.**  Each of the following shall constitute a "**Forbearance Default**" hereunder and an Event of Default under the Sales Agreement:

(a)     Kickhass fails or neglects to perform, keep or observe any covenant set forth in this Agreement including, without limitation, the failure to complete (i) two (2) consecutive Forbearance Milestones by the applicable date set forth in <u>Section 4.3</u> hereof or (ii) any three (3) Forbearance Milestones by the applicable date set forth in <u>Section 4.3</u> hereof;

(b)     any representation or warranty of Kickhass contained in this Agreement or any document delivered in connection herewith (including, without limitation, each document required to be delivered in connection with the conditions precedent set forth in <u>Section 3</u> hereof) proves to have been false or misleading in any material respect on the date when made or deemed to have been made (except to the extent already qualified by materiality, in which case it shall be true and correct in all respects and shall not be false or misleading in any respect) except those made as of a specific date; or

(c)     the occurrence of any Additional Event of Default.

**SECTION 5.   RELEASES**.

**(A)**     FOR AND IN CONSIDERATION OF SILO'S AND JEFFERIES' AGREEMENTS CONTAINED HEREIN, KICKHASS, TOGETHER WITH ITS PARENTS, DIVISIONS, SUBSIDIARIES, AFFILIATES, MEMBERS, MANAGERS, PARTICIPANTS, PREDECESSORS, SUCCESSORS AND ASSIGNS, AND ITS CURRENT AND FORMER OFFICERS, SHAREHOLDERS, MEMBERS, MANAGERS, PARTNERS, AGENTS AND EMPLOYEES, AND ITS PREDECESSORS, SUCCESSORS, HEIRS AND ASSIGNS (INDIVIDUALLY AND COLLECTIVELY, THE "**KICKHASS RELEASORS**") HEREBY VOLUNTARILY AND KNOWINGLY RELEASE AND FOREVER WAIVE AND DISCHARGE SILO AND JEFFERIES AND EACH OF THEIR RESPECTIVE PARENTS, DIVISIONS, SUBSIDIARIES, AFFILIATES, MEMBERS, MANAGERS, PARTICIPANTS, PREDECESSORS, SUCCESSORS AND ASSIGNS, AND EACH OF ITS CURRENT AND FORMER DIRECTORS, OFFICERS, SHAREHOLDERS, MEMBERS, MANAGERS, PARTNERS, AGENTS AND EMPLOYEES, AND EACH OF THEIR RESPECTIVE PREDECESSORS, SUCCESSORS, HEIRS AND ASSIGNS (INDIVIDUALLY AND COLLECTIVELY, THE "**SILO AND JEFFERIES RELEASED PARTIES**") FROM ALL POSSIBLE CLAIMS, COUNTERCLAIMS, DEMANDS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, ANTICIPATED OR UNANTICIPATED, SUSPECTED OR UNSUSPECTED, FIXED, CONTINGENT OR CONDITIONAL OR AT LAW OR IN EQUITY, THAT ANY OF THE KICKHASS RELEASORS MAY NOW HAVE AGAINST THE SILO AND JEFFERIES RELEASED PARTIES ARISING THROUGH THE DATE OF THIS AGREEMENT, IF ANY, IRRESPECTIVE OF WHETHER ANY SUCH CLAIMS ARISE OUT OF CONTRACT, TORT, VIOLATION OF LAW OR REGULATIONS OR OTHERWISE, INCLUDING WITHOUT LIMITATION ARISING DIRECTLY OR INDIRECTLY FROM ANY LAWSUIT, ANY PRIOR OR EXISTING LOANS BETWEEN THE KICKHASS RELEASORS AND THE SILO AND JEFFERIES RELEASED PARTIES, ANY OF THE FACILITY DOCUMENTS, THE EXERCISE OF ANY RIGHTS AND REMEDIES UNDER ANY OF THE FACILITY DOCUMENTS AND/OR NEGOTIATION FOR AND EXECUTION OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY CONTRACTING FOR, CHARGING, TAKING, RESERVING, COLLECTING OR RECEIVING INTEREST IN EXCESS OF THE

HIGHEST LAWFUL RATE APPLICABLE. EACH OF THE KICKHASS RELEASORS WAIVES THE BENEFITS OF ANY LAW, WHICH MAY PROVIDE IN SUBSTANCE: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MUST HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE DEBTOR." EACH OF THE KICKHASS RELEASORS UNDERSTANDS THE FACTS IT BELIEVES TO BE TRUE AT THE TIME OF MAKING THE RELEASE PROVIDED FOR HEREIN MAY LATER TURN OUT TO BE DIFFERENT THAN IT NOW BELIEVES, AND INFORMATION NOT NOW KNOWN OR SUSPECTED MAY LATER BE DISCOVERED. EACH OF THE KICKHASS RELEASORS ACCEPTS THIS POSSIBILITY, AND EACH OF THEM ASSUMES THE RISK OF THE FACTS TURNING OUT TO BE DIFFERENT AND NEW INFORMATION BEING DISCOVERED AND EACH OF THEM FURTHER AGREES THE RELEASE PROVIDED FOR HEREIN SHALL IN ALL RESPECTS CONTINUE TO BE EFFECTIVE AND NOT SUBJECT TO TERMINATION OR RESCISSION BECAUSE OF ANY DIFFERENCE IN SUCH FACTS OR ANY NEW INFORMATION.

(B) FOR AND IN CONSIDERATION OF KICKHASS' AGREEMENT CONTAINED HEREIN, UPON THE TIMELY COMPLETION OF THE PAYMENT MILESTONES REFERENCED IN SECTION 4.3 OF THIS AGREEMENT AND THE PAYMENT BY KICKHASS OF ALL AMOUNTS REQUIRED TO BE PAID HEREUNDER (THE "**SILO AND JEFFERIES RELEASE DATE**"), SILO AND JEFFERIES, TOGETHER WITH THEIR PARENTS, DIVISIONS, SUBSIDIARIES, AFFILIATES, MEMBERS, MANAGERS, PARTICIPANTS, PREDECESSORS, SUCCESSORS AND ASSIGNS, AND ITS CURRENT AND FORMER OFFICERS, SHAREHOLDERS, MEMBERS, MANAGERS, PARTNERS, AGENTS AND EMPLOYEES, AND ITS PREDECESSORS, SUCCESSORS, HEIRS AND ASSIGNS (INDIVIDUALLY AND COLLECTIVELY, THE "**SILO AND JEFFERIES RELEASORS**") SHALL HEREBY VOLUNTARILY AND KNOWINGLY RELEASE AND FOREVER WAIVE AND DISCHARGE KICKHASS AND EACH OF THEIR RESPECTIVE PARENTS, DIVISIONS, SUBSIDIARIES, AFFILIATES, MEMBERS, MANAGERS, PARTICIPANTS, PREDECESSORS, SUCCESSORS AND ASSIGNS, AND EACH OF ITS CURRENT AND FORMER DIRECTORS, OFFICERS, SHAREHOLDERS, MEMBERS, MANAGERS, PARTNERS, AGENTS AND EMPLOYEES, AND EACH OF THEIR RESPECTIVE PREDECESSORS, SUCCESSORS, HEIRS AND ASSIGNS (INDIVIDUALLY AND COLLECTIVELY, THE "**KICKHASS RELEASED PARTIES**") FROM ALL POSSIBLE CLAIMS, COUNTERCLAIMS, DEMANDS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, ANTICIPATED OR UNANTICIPATED, SUSPECTED OR UNSUSPECTED, FIXED, CONTINGENT OR CONDITIONAL OR AT LAW OR IN EQUITY, THAT ANY OF THE RELEASORS MAY NOW HAVE AGAINST THE RELEASED PARTIES ARISING THROUGH THE DATE OF THIS AGREEMENT, IF ANY, IRRESPECTIVE OF WHETHER ANY SUCH CLAIMS ARISE OUT OF CONTRACT, TORT, VIOLATION OF LAW OR REGULATIONS OR OTHERWISE, INCLUDING WITHOUT LIMITATION ARISING DIRECTLY OR INDIRECTLY FROM ANY LAWSUIT, ANY PRIOR OR EXISTING LOANS BETWEEN THE RELEASORS AND THE RELEASED PARTIES, ANY OF THE FACILITY DOCUMENTS, THE EXERCISE OF ANY RIGHTS AND REMEDIES UNDER ANY OF THE FACILITY DOCUMENTS AND/OR NEGOTIATION FOR AND

EXECUTION OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY CONTRACTING FOR, CHARGING, TAKING, RESERVING, COLLECTING OR RECEIVING INTEREST IN EXCESS OF THE HIGHEST LAWFUL RATE APPLICABLE. ON THE SILO AND JEFFERIES RELEASE DATE, EACH OF THE SILO AND JEFFERIES RELEASORS SHALL WAIVE THE BENEFITS OF ANY LAW, WHICH MAY PROVIDE IN SUBSTANCE: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MUST HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE DEBTOR." EACH OF THE SILO AND JEFFERIES RELEASORS UNDERSTANDS THE FACTS IT BELIEVES TO BE TRUE AT THE TIME OF MAKING THE RELEASE PROVIDED FOR HEREIN MAY LATER TURN OUT TO BE DIFFERENT THAN IT NOW BELIEVES, AND INFORMATION NOT NOW KNOWN OR SUSPECTED MAY LATER BE DISCOVERED. EACH OF THE SILO AND JEFFERIES RELEASORS ACCEPTS THIS POSSIBILITY, AND EACH OF THEM ASSUMES THE RISK OF THE FACTS TURNING OUT TO BE DIFFERENT AND NEW INFORMATION BEING DISCOVERED AND EACH OF THEM FURTHER AGREES THE RELEASE PROVIDED FOR HEREIN SHALL IN ALL RESPECTS CONTINUE TO BE EFFECTIVE AND NOT SUBJECT TO TERMINATION OR RESCISSION BECAUSE OF ANY DIFFERENCE IN SUCH FACTS OR ANY NEW INFORMATION.

## SECTION 6.   MISCELLANEOUS

**6.1    Reference to and Effect on the Sales Agreement and the Other Facility Documents**.

(a)    On and after the Forbearance Effective Date, each reference in the Sales Agreement to "this Agreement", "hereunder", "hereof" or words of like import referring to the Sales Agreement, and each reference in the Note Purchase Documents and the other Facility Documents to "the Sales Agreement", "thereunder", "thereof" or words of like import referring to the Sales Agreement, shall mean and be a reference to the Sales Agreement, as amended by this Agreement. This Agreement is hereby designated as a Facility Document for all purposes of the Facility Documents.

(b)    Except as expressly set forth herein, no other amendments, changes or modifications to the Sales Agreement and each other Facility Document are intended or implied, and in all other respects the Sales Agreement and each other Facility Document are and shall continue to be in full force and effect and are hereby in all respects specifically ratified, restated and confirmed by all parties hereto as of the Forbearance Effective Date and Kickhass shall not be entitled to any other further amendment by virtue of the provisions of this Agreement or with respect to the subject matter of this Agreement. To the extent of conflict between the terms of this Agreement and the other Facility Documents, the terms of this Agreement shall control. The Sales Agreement and this Agreement shall be read and construed as one agreement.

(c)    The execution, delivery and effectiveness of this Agreement shall not, except as expressly provided herein, operate as a waiver of any right, power or remedy of Silo or Jefferies under the Sales Agreement, nor constitute a waiver of any provision of the Sales Agreement.

        **6.2**     **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and their respective successors and assigns.

        **6.3**     **Incorporation by Reference**. <u>Sections 24</u> and <u>25</u> of the Sales Agreement are hereby incorporated by reference, *mutatis mutandi*.

[<em>remainder intentionally left blank</em>]

IN WITNESS THEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**DASAGROUP HOLDINGS CORP. (D/B/A KICKHASS AVOCADOS)**,

By _____
Name: Philip Ward
Title: Pres.

**SILO TECHNOLOGIES INC.**,

By _____
Name: Ashton Braun
Title: CEO

**JEFFERIES FUNDING LLC**,

By_____
Name: Michael Wade
Title: Managing Director

IN WITNESS THEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**DASAGROUP HOLDINGS CORP. (D/B/A KICKHASS AVOCADOS),**

By _____
Name:
Title:

**SILO TECHNOLOGIES INC.,**

By _____
Name: Ashton Braun
Title: CEO

**JEFFERIES FUNDING LLC,**

By _____
Name: Michael Wade
Title: Managing Director

**Exhibit A**

**Affected Receivables**

**(see attached)**

| SELLER_ACCOUNT_ID | FUNDING_ID | Receivable ID | Principal Outstanding | Amount Outstanding | Fees Outstanding | Days Overdue |
|---|---|---|---|---|---|---|
| 55802 | 44028 | Kickhass Avocados10775 | 89856 | 97610.24 | 7754.24 | 58 |
| 55802 | 44024 | Kickhass Avocados10771 | 93888 | 102598.72 | 8710.72 | 63 |
| 55802 | 44619 | Kickhass Avocados10776 | 97200 | 104328 | 7128 | 48 |
| 55802 | 42947 | Kickhass Avocados10756 | 80443.8 | 88845.71 | 8401.91 | 72 |
| 55802 | 42950 | Kickhass Avocados10754 | 66944.98 | 74818.81 | 7873.83 | 73 |
| 55802 | 43085 | Kickhass Avocados10760 | 89798.4 | 98362.51 | 8564.11 | 65 |
| 55802 | 44620 | Kickhass Avocados10778 | 93096 | 99923.04 | 6827.04 | 48 |
| 55802 | 44622 | Kickhass Avocados10777 | 93168 | 100121.1 | 6953.1 | 49 |
| 55802 | 42949 | Kickhass Avocados10752 | 74664 | 82559.03 | 7895.03 | 73 |
| 55802 | 45009 | Kickhass Avocados10782 | 89406 | 95267.06 | 5861.06 | 42 |
| 55802 | 45008 | Kickhass Avocados10781 | 91494 | 97491.94 | 5997.94 | 42 |
| 55802 | 42948 | Kickhass Avocados10757 | 83106 | 91785.96 | 8679.96 | 72 |
| 55802 | 43087 | Kickhass Avocados10762 | 92718 | 101560.55 | 8842.55 | 65 |
| 55802 | 44026 | Kickhass Avocados10773 | 91728 | 99762.7 | 8034.7 | 59 |
| 55802 | 44621 | Kickhass Avocados10779 | 89424 | 95981.76 | 6557.76 | 48 |
| 55802 | 43084 | Kickhass Avocados10759 | 88488 | 96927.14 | 8439.14 | 65 |
| 55802 | 43092 | Kickhass Avocados10767 | 90720 | 99489.6 | 8769.6 | 66 |
| 55802 | 43815 | Kickhass Avocados10770 | 71568 | 78300.7 | 6732.7 | 64 |
| 55802 | 42946 | Kickhass Avocados10755 | 58248 | 64331.68 | 6083.68 | 72 |
| 55802 | 45011 | Kickhass Avocados10780 | 97740 | 104274.1 | 6534.1 | 43 |
| 55802 | 43090 | Kickhass Avocados10765 | 90720 | 99489.6 | 8769.6 | 66 |
| 55802 | 43086 | Kickhass Avocados10761 | 93456 | 102368.94 | 8912.94 | 65 |
| 55802 | 43089 | Kickhass Avocados10764 | 90720 | 99489.6 | 8769.6 | 66 |
| 55802 | 43083 | Kickhass Avocados10758 | 88488 | 96927.14 | 8439.14 | 65 |
| 55802 | 43816 | Kickhass Avocados10768 | 30626.95 | 36626.89 | 5999.94 | 65 |
| 55802 | 45007 | Kickhass Avocados10784 | 90828 | 96664.54 | 5836.54 | 41 |
| 55802 | 43088 | Kickhass Avocados10763 | 84019.49 | 92640.19 | 8620.7 | 66 |
| 55802 | 43031 | Kickhass Avocados10751 | 7080.67 | 16828.94 | 9748.27 | 76 |
| 55802 | 43091 | Kickhass Avocados10766 | 90720 | 99489.6 | 8769.6 | 66 |
| 55802 | 43814 | Kickhass Avocados10769 | 75785.4 | 82914.85 | 7129.45 | 64 |
| 55802 | 45010 | Kickhass Avocados10783 | 94284 | 100464.84 | 6180.84 | 42 |
| 55802 | 42945 | Kickhass Avocados10753 | 75816 | 83734.56 | 7918.56 | 72 |
| 55802 | 44027 | Kickhass Avocados10774 | 89082 | 96884.93 | 7802.93 | 59 |
| 55802 | 44025 | Kickhass Avocados10772 | 90499.5 | 98778.54 | 8279.04 | 62 |

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

JEFFERIES FUNDING LLC

**(b)** County of Residence of First Listed Plaintiff    New York County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See Attachement

## DEFENDANTS

DASAGROUP HOLDINGS CORP. (d/b/a KICKHASS AVOCADOS); LONDON FRUIT, INC.

County of Residence of First Listed Defendant    King County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

See Attachement

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☐ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☒ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 710 Fair Labor Standards Act | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 740 Railway Labor Act | 835 Patent–Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | 370 Other Fraud | 751 Family and Medical Leave Act | 840 Trademark | 460 Deportation |
| | 350 Motor Vehicle | 371 Truth in Lending | | 880 Defend Trade Secrets Act of 2016 | 470 Racketeer Influenced & Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 790 Other Labor Litigation | | 480 Consumer Credit |
| 160 Stockholders' Suits | 360 Other Personal Injury | 385 Property Damage Product Liability | 791 Employee Retirement Income Security Act | **SOCIAL SECURITY** | 485 Telephone Consumer Protection Act |
| ☒ 190 Other Contract | 362 Personal Injury –Medical Malpractice | | | 861 HIA (1395ff) | 490 Cable/Sat TV |
| 195 Contract Product Liability | | | **IMMIGRATION** | 862 Black Lung (923) | 850 Securities/Commodities/ Exchange |
| 196 Franchise | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 462 Naturalization Application | 863 DIWC/DIWW (405(g)) | 890 Other Statutory Actions |
| **REAL PROPERTY** | 440 Other Civil Rights | **HABEAS CORPUS** | 465 Other Immigration Actions | 864 SSID Title XVI | 891 Agricultural Acts |
| 210 Land Condemnation | 441 Voting | 463 Alien Detainee | | 865 RSI (405(g)) | 893 Environmental Matters |
| 220 Foreclosure | 442 Employment | 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | 895 Freedom of Information Act |
| 230 Rent Lease & Ejectment | 443 Housing/ Accommodations | 530 General | | 870 Taxes (U.S. Plaintiff or Defendant) | 896 Arbitration |
| 240 Torts to Land | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | 871 IRS–Third Party 26 USC § 7609 | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 245 Tort Product Liability | 446 Amer. w/Disabilities–Other | **OTHER** | | | |
| 290 All Other Real Property | 448 Education | 540 Mandamus & Other | | | 950 Constitutionality of State Statutes |
| | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District (specify) | ☐ 6 Multidistrict Litigation–Transfer    ☐ 8 Multidistrict Litigation–Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332

Brief description of cause:
Plaintiff alleges claims of breach of contract against defendants Dasagroup Holdings Corp (d/b/a Kickhass Avacados) ("Kickhass") and London Fruit, Inc., as well as claims of fraud and conversion against defendant Kickhass.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

DEMAND $ 2,896,031.23

CHECK YES only if demanded in complaint:
**JURY DEMAND:**    ☒ Yes    ☐ No

## VIII. RELATED CASE(S), IF ANY *(See instructions):*

JUDGE

DOCKET NUMBER

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

(Place an "X" in One Box Only)    ☒ SAN FRANCISCO/OAKLAND    ☐ SAN JOSE    ☐ EUREKA-MCKINLEYVILLE

DATE    08/21/2024    SIGNATURE OF ATTORNEY OF RECORD    Michael T. Jones

*Attorneys for Plaintiff Jefferies Funding LLC*

HOLLAND & KNIGHT LLP
Michael T. Jones (SBN 290660)
Rebecca G. Durham (SBN 319403)
560 Mission Street, Suite 1900
San Francisco, CA 94105
(415) 743-6900
m.jones@hklaw.com
rebecca.durham@hklaw.com

Martin L. Seidel
Stosh M. Silivos
Kelly McNeill
787 Seventh Ave., 31st Floor
New York, NY 10019
(212) 513-3200
martin.seidel@hklaw.com
stosh.silivos@hklaw.com
kelly.mcneill@hklaw.com

*Attorney for Defendant Dasagroup Holdings Corp. (d/b/a Kickhass Avocados)*

GOLDFARB & HUCK ROTH RIOJAS PLLC
R. Omar Riojas
925 Fourth Avenue, Suite 3950
Seattle, WA 98104
riojas@goldfarb-huck.com
(206) 492-7398

# EXHIBIT B

# UNITED STATES DISTRICT COURT

for the
Northern District of California

JEFFERIES FUNDING LLC )
)
*Plaintiff* )
)
v. )
) Civil Action No. 3:24-cv-05639-SK
)
DASAGROUP HOLDINGS CORP. (d/b/a KICKHASS )
AVOCADOS) and LONDON FRUIT, INC )
)
*Defendant* )

## AFFIDAVIT OF SERVICE

I, Andrea Lopez, being duly sworn, state:

I am 18 years or older and not a party to this action or a member of a corporation or organization that is a party to this action.

I served the following documents to London Fruit, Inc. in Hidalgo County, TX on August 26, 2024 at 9:27 am at 9010 S Cage Blvd., Pharr, TX 78577 by leaving the following documents with Emma Gonzalez who as Controller/ Employee Authorized to Accept is authorized by appointment or by law to receive service of process for London Fruit, Inc.

Summons
Complaint
Civil Cover Sheet

Hispanic or Latino Female, est. age 45-54, glasses: N, Brown hair, 120 lbs to 140 lbs, 5' to 5' 3".
Geolocation of Serve: https://google.com/maps?q=26.1067064006,-98.1993457069
Photograph: See Exhibit 1

Total Cost: $225.00

Proof Job #647123

Page 1

Andrea Lopez - +1 (956) 854-1233
Registration No.: PSC-19740
Registration County: TX State

Subscribed and sworn to before
me this 27th day of
August, 2024, by
Andrea Lopez.
Witness my hand and official
seal.

Notary Public

My commission expires:
May 16, 2025



RUBY ANN FERNANDEZ
Notary Public, State of Texas
Notary ID# 12942732-4
My Commission Expires 05-16-2025



Exhibit 1a)

London Fruit Inc.