MARIO A. MOYA (State Bar No. 262059)
REBECCA M. HOBERG (State Bar No. 224086)
MOYA LAW FIRM
1300 Clay Street, Suite 600
Oakland, California 94612
Tel: 510.926.6521
Fax: 510.340.9055
Email: mmoya@moyalawfirm.com
        rhoberg@moyalawfirm.com

Attorneys for Defendant
DASAGROUP HOLDINGS CORP.
  d/b/a KICKHASS AVOCADOS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JEFFERIES FUNDING, LLC,<br><br>Plaintiff,<br><br>v.<br><br>DASAGROUP HOLDINGS CORP. (d/b/a KICKHASS AVOCADOS) and LONDON FRUIT, INC.,<br><br>Defendants. | Case No. 3:24-cv-05639-SK<br><br>**DEFENDANT DASAGROUP HOLDINGS CORP. (d/b/a KICKHASS AVOCADOS)'S FIRST AMENDED THIRD-PARTY COMPLAINT AGAINST SILO TECHNOLOGIES, INC.**<br><br>JURY TRIAL DEMANDED |
| DASAGROUP HOLDINGS CORP. (d/b/a KICKHASS AVOCADOS),<br><br>    Counter- and Cross-Claimant,<br>v.<br><br>JEFFERIES FUNDING, LLC,<br><br>    Counter-Defendant,<br><br>and LONDON FRUIT, INC.,<br><br>    Cross-Defendant. | |

DEFENDANT DASAGROUP HOLDING CORP.'S FIRST AM. THIRD-PARTY COMPLAINT

DASAGROUP HOLDINGS CORP. (d/b/a
KICKHASS AVOCADOS),

     Defendant/Third-Party Plaintiff,

    v.

SILO TECHNOLOGIES, INC.,

     Third-PartyDefendant.

Pursuant to Federal Rule of Civil Procedure 14(a)(1), Defendant Dasagroup Holdings, Inc. d/b/a Kickhass Avocados ("Defendant" or "Dasagroup" or "Kickhass" as appropriate by context[1]) hereby asserts the following First Amended Third-Party complaint against third-party defendant Silo Technologies, Inc. ("Silo").

## PARTIES

1.    Defendant and Third-Party Claimant Dasagroup Holdings Corp. dba Kickhass Avocados ("Defendant" or "Dasagroup" or "Kickhass") is a Washington corporation with its principal place of business in Shoreline, Washington.

2.    Plaintiff Jefferies Funding LLC ("Plaintiff") is a Delaware limited liability company with its principal place of business in New York, New York.

3.    Co-defendant London Fruit, Inc. ("Co-Defendant") is a Texas corporation (now known as London Fruit, LLC, a Texas limited liability company). On information and belief, its principal place of business is San Francisco, California.

4.    Third-Party Defendant Silo Technologies, Inc. ("Silo") is a Delaware corporation registered to do business in California, with its principal place of business in San Francisco, California.

## JURISDICTION

---

[1] In its complaint, Plaintiff refers to Dasagroup by its trade name "Kickhass," while Defendant's pleadings use the corporate name "Dasagroup."

5. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1332 and 1367. Diversity of citizenship exists between the parties; the amount in controversy exceeds $75,000; and this third-party claim asserted are also within the supplemental jurisdiction of this Honorable Court.

6. Venue in this District is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the complaint occurred in this District. Moreover, assignment to the San Francisco Division is appropriate under Civil Local Rule 3-2(d) because a substantial part of the events giving rise to the claims occurred in San Francisco County, California, where, upon information and belief, Third-Party Defendant Silo Technologies maintains its principal place of business in San Francisco, California.

7. Pursuant to the choice of law provision in the parties' Master Services Agreement (at   42), California law governs the parties' rights and obligations in this matter.

## GENERAL ALLEGATIONS

8. Kickhass buys and sells wholesale quantities of perishable agricultural commodities, to whit, avocados in interstate and/or foreign commerce.

**A. The Purveyance of Perishable Agricultural Goods Is a Time-Sensitive, Critical Business for the Country's Food Supply, Which is Why Congress Enacted the Perishable Agricultural Commodities Act of 1930.**

9. Kickhass trades in fresh fruit commodities the United States Department of Agriculture ("USDA") expressly recognize as commodities covered under the provisions of the Perishable Agricultural Commodities Act, 1930, *as amended*, 7 U.S.C. §§ 499a-499t ("PACA"). PACA was enacted in 1930 "to facilitate the free flow of perishable agricultural commodities in interstate commerce by regulating that commerce through the licensing of commission merchants, dealers and brokers engaged in it and the prohibiting of various kinds of unfair conduct. . . ." *Rothenberg v. H. Rothstein & Sons*, 183 F.2d 524, 526 (3d Cir. 1950). This purpose included efforts to "eliminate unfair practices in the marketing of perishable agricultural commodities in interstate commerce in the case of a declining market by making it difficult for unscrupulous persons to take advantage of shippers by wrongful rejection of the goods upon arrival at a point where it is expensive and impracticable for the shipper to enforce his legal rights." *See LeRoy Dyal Co. v. Allen*, 161 F.2d 152, 156 (4th Cir. 1947).

---

DEFENDANT DASAGROUP HOLDING CORP.'S FIRST AM. THIRD-PARTY COMPLAINT

10.     The statute "was amended in 1984 to provide unique credit protection to sellers of perishable agricultural commodities," who, Congress found, "had a need to move their inventories quickly" and "were often required to become unsecured creditors of their purchasers, whose credit they were often unable to verify." *Nickey Gregory Co., LLC v. AgriCap, LLC*, 597 F.3d 591, 594 (4th Cir. 2010).  To avoid this problem and to ensure that sellers of produce were actually paid for what they sell, the 1984 amendments impressed a statutory trust on perishable commodities and their proceeds for the benefit of unpaid sellers.  *See* 7 U.S.C. § 499e(c)(2) (imposing a statutory trust over any goods, receivables, or proceeds from perishable agricultural commodities until full payment is made).  In clear, unmistakable language contained in the statutory text, these amendments expressly stated that Congress found secured financing arrangements that encumber "food" and "any receivables of proceeds from the sale of such commodities" to be "contrary to the public interest":

> It is hereby found that a burden on commerce in perishable agricultural commodities is caused by financing arrangements under which commission merchants, dealers, or brokers, who have not made payment for perishable agricultural commodities purchased, contracted to be purchased, or otherwise handled by them on behalf of another person, encumber or give lenders a security interest in, such commodities, or on inventories of food or other products derived from such commodities, and any receivables or proceeds from the sale of such commodities or products, and that such arrangements are contrary to the public interest. This subsection is intended to remedy such burden on commerce in perishable agricultural commodities and to protect the public interest.

7 U.S.C. § 499e(c)(1).

11.     As one member of Congress noted during subcommittee hearings of the House Committee on Agriculture that reviewed the 1984 amendments to PACA , "Sound credit, fair trade practices, and a reliable payment performance are essential to the health of the entire industry."  Recommendations to Improve the Perishable Agricultural Commodities Act:  Hearing Before the Subcomm. on Domestic Marketing, Consumer Relations and Nutrition, 98 Cong. 2 (1991) (opening remarks of Rep. L. Panetta).  While "PACA has minimized many interruptions in the marketing of perishables," "under current law [i.e., pre-1984 law], in the case of slow pay or nonpay, sellers of fruits and vegetables are treated as unsecured creditors, which means they get little protection in the event of [a] financial claim against buyers."  Id.  The creation of a

statutory trust was intended to remedy this. The subcommittee also recognized that another purpose of the 1984 amendments was to cure onerous factoring arrangements that compounded the risk of sellers of produce when their buyers failed to pay or became insolvent:

> Produce, under accounts receivable, is often assigned to [a] lender without any guarantee that the seller will recover more than a small amount of the value of his produce," and "[c]onsequently, the financial position of sellers is extremely vulnerable vis-a-vis collecting on the debt when [a] buyer becomes insolvent.

*Id.*

12.     For this reason, in enacting PACA, Congress has made a clear choice that the rights of agricultural growers are to be given priority over the rights of secured lenders via the PACA trust. *See S & H Packing & Sales Co. v. Tanimura Distrib.*, 883 F.3d 797, 813 (9th Cir. 2018). As one federal appellate court has aptly observed, because "sellers of perishable commodities increasingly suffered the risk of the uncollectability of amounts owed by the purchasers, especially because the purchasers gave superior security interests to their lenders, Congress enacted the 1984 amendments to protect the commodities sellers by giving them a priority position over even secured creditors."

**B.  Silo and Its Powerful Backers in the Venture Capital and Private-Credit Industries Moved Fast to Deploy Private Capital Via Short-Term Loans to Sellers of Perishable Produce Like Dasagroup.**

13.     Third-Party Defendant Silo Technologies, Inc. ("Silo"), the alleged predecessor in interest of Plaintiff Jeffries on the debt that is the subject of its lawsuit, was a Delaware corporation registered to do business in California with its principal place of business in San Francisco, California. Silo is a venture-backed start up company that was originally founded in 2018 as "a technology-driven marketplace that uses AI to streamline supply chains for perishable agribusiness."[2] As originally envisioned, "Silo's AI and machine learning technology" would "adapt[] to existing workflows, seamlessly automating the entire supply chain from harvest management, to forecasting and negotiation, through QC and logistics." *Id.* By mid-2019, the company announced a $3 million seed round of financing by heavy-hitters in the venture capital industry.

---

[2] Press Release: *Silo Lands $3 Million Seed Round to Bring Wholesale, Perishable Agriculture Online* (May 23, 2019)

14.     By 2020, the company had received backing from prominent VC firm Andreessen Horowitz.  In describing its investment in Silo, one of the firm's general partners described the company in effusive terms, specifically with respect to the promise it held to promote what appears to be more partnerships and better vertical integration of the perishable produce industry, the downstream logistics industry, and potential future partnerships with private capital:

> [T]he agriculture industry . . . has largely remained unchanged by technology, despite being the largest category of consumer spend, the presence of massive waste (40 percent of perishable food is wasted in the supply chain), and a renewed focus on having a resilient food supply chain in a post-COVID era. *Food distributors are at the heart of this supply chain — they are responsible for connecting growers, grocers, restaurants, and even other distributors. And this dense network of relationships requires a high degree of operational and logistical excellence*, as fresh food begins losing value the moment it enters the supply chain. [¶]
> That's why we were so excited when we met . . . the founders of Silo: an operating system and system of record for wholesale food distributors that is reducing waste, improving margins, and catalyzing an historic shift from pencil and paper (really) to software.  The product has exceptionally strong market fit because it solves so many of the operational problems that distributors have. Price sheets, inventory, purchase orders, logistics, and even accounting is all handled on the Silo platform . . . . [¶] *Silo is a "system of record" for wholesale food predicated on partnering with and supporting existing distributors, instead of competing with or otherwise "disrupting" them. As a result, there is a strong network emerging, which Silo's technology aims to assist in driving further reductions in spoilage **and increasing profits for all participants within the supply chain. We believe that financial services will be a key enabler of this ecosystem, where factoring and faster payments, coupled with laws like PACA, can solve many of the cashflow challenges that growers and distributors face**.*[3]

15.     That vision appears to have come to fruition.  In 2022, Silo proudly announced that it had secured a $100 million lending commitment from Plaintiff Jefferies to fund Silo's Instant Pay Program, which would provide short-term capital to purveyors of agricultural commodities who use Silo's platform.[4]  By 2023, logistics and supply-chain management had become a magnet for even more private VC funding, as private investors hoping to find the next

---

[3] Andreessen Horowitz Blog: *Investing in Silo* (Sept. 24, 2020) ("Price sheets, inventory, purchase orders, logistics, and even accounting is all handled on the Silo platform . . . . [¶] We believe that financial services will be a key enabler of this ecosystem, where factoring and faster payments, coupled with laws like PACA, can solve many of the cashflow challenges that growers and distributors face.").
[4] Silo Blog post: *Silo Enters into Financing with Jefferies to Help More Produce Suppliers and Distributors Unlock the Cash Flow Needed to Thrive* (announcement as of June 30, 2022).

"unicorn" company, poured money into logistics startups.[5]  Silo was one of these private equity-backed logistics start-ups that benefited from this influx of capital, and it was touted in Forbes as having unicorn potential.  In July 2023, Silo announced that it had received $132 million of even more new capital in the form of an additional $100 million lending facility from First Citizens bank, in addition to a $32 million Series C round of investment led by Koch Disruptive Technologies, a subsidiary of Koch Industries, a global leader in supply chain logistics.[6]

16.     Unbeknownst to Dasagroup and other participants in Silo's Instant Pay Program, the loans provided by Silo in exchange for their factored receivables were funded by Silo's financier Jefferies, and not Silo itself.  Dasagroup was also unaware that (i) Silo was an unlicensed lender with respect to the Instant Pay Program and (ii) Jefferies was a silent lender whose parent company, Jefferies Financial Group, was a conflicted investor in Silo.  Only recently, Dasagroup has come to learn that the money that was paid to Dasagroup as part of the factoring arrangement originated from Jefferies, whose ultimate parent, Jefferies Financial Group, was owned in part by Blackrock, Inc., a private equity firm that was a key financier of Silo's most direct competitor in the AI ag-tech space, Grubmarket, Inc.   Dasagroup was completely unaware of this this conflict of interest — i.e., that Jefferies it was extending credit to Silo while its parent company's 7.5% owner, Blackrock (the *largest or second-largest shareholder* in Jefferies Financial at the time), had a considerable ownership stake in Grubmarket via at least two rounds of disclosed Series D and Series E investments.  This is significant when Dasagroup made so much of its sensitive commercial data available to Silo through its Instant Pay Program as per a borrower's expectation of confidentiality and good faith with its lender.   It is also significant because, as described *infra*, Grubmarket eventually came to purchase Dasagroup's largest customer, defendant London Fruit, which was originally a Texas-based produce distributor, at a time when Dasagroup was already a participant in its Instant Pay Program and was continuing to factor its receivables with London Fruit through the program.

---

[5] TrueBridge Capital, *Trends from This Year's New Billion Dollar Startup List.*  Forbes (Aug. 15, 2023).
[6] PR Newswire: *Silo Lands $132 Million to Support the Food Supply Chain* (Jul. 12, 2023).

17.     At no time, however, was Dasagroup informed that the credit terms, approvals, repayment policies, or exercise of payment rights and obligations under the Silo Instant Pay Program could be influenced by Jefferies's conflict of interest — i.e., exercised in such a way that would benefit Silo's direct competitor, Grubmarket, rather than Silo itself and loyal clientele like Dasagroup.  Also, at no time was Dasagroup informed of the potential risks that its most sensitive and critical business information it intended to share with Silo —i.e., competitive intelligence about Dasagroup's pricing, suppliers, and customers — could possibly be shared with a financial institution beholden to the interests of Silo's direct competitor, Grubmarket, who fatefully purchased Dasagroup's largest customer, London Fruit, Inc., a Texas-based wholesaler.[7] After the acquisition, for reasons explained below, London Fruit and Grubmarket began stretching payments, underpaying on shipments, and later stopped paying altogether, which precipitated this litigation when Dasagroup did not have the cash flow on hand to make excessive payments demanded by Jefferies and Silo.  Had Jefferies's status as Silo's silent lender been disclosed to Dasagroup as part of the Instant Pay Program with disclosure of the potential conflicts existing between Jefferies, Blackrock and Grubmarket, Dasagroup could have known that Silo was susceptible to Jefferies' conflicted interests, that Jefferies had the potential to suddenly disrupt Silo and Dasagroup's course of dealing, and also that Grubmarket's purchase of London Fruit presented a unique business risk to Dasagroup by virtue of Dasagroup's continued participation in Silo's Instant Pay program.

18.     Although Silo originally portrayed itself as a company devoted to helping persons in the agricultural supply chain — and even advertised its product a one-stop software solution for financing and obtaining quotes for logistics carrier costs — it seems to have lost its way. According to the complaint filed by Jefferies in this action, Silo defaulted on its secured lending facility with Jefferies and entered into a forbearance arrangement with the financier on May 8, 2024, which was quickly followed by reports that Silo had laid off roughly 30% of its staff.[8]  The

---

[7] Grubmarket Press Release: *GrubMarket Acquires London Fruit to Expand Further in Texas* (Aug. 3, 2023).
[8] TechCrunch, *Food supply chain software maker Silo lays off ~30% of staff amid M&A discussions* (May 22, 2024).

---

DEFENDANT DASAGROUP HOLDING CORP.'S FIRST AM. THIRD-PARTY COMPLAINT

amount of money raised by the company and the amount of private capital so made available to deploy to the platform's users is truly impressive and is reported to have exceeded $272 million.[9]

## C. In June 2022, Dasagroup Began Factoring Certain Receivables For Its Produce Sales Under Silo's Instant Pay Program.

19.     On June 6, 2022, Dasagroup and Silo executed an agreement for Dasagroup to participate in Silo's Instant Pay Program.  The one-page Order Form signed by the parties was subject to a "Master Services Agreement" that was deemed to be "incorporated by reference" on the face of the document, but that was hyperlinked to refer visitors to a differently-named document online entitled the "Supplier Receivable Sales Agreement."  At no time did Dasagroup learn that the program was a recourse lending program or was informed that Silo was not licensed to lend or broker commercial loans.

20.     The Supplier Receivable Sales Agreement was anything but a sales agreement; in substance and operation, it was nothing more than a short-term lending facility.  In simple terms, the Agreement, which was governed by California law, generally contemplated the following arrangement:  The "Supplier" (here, Dasagroup) could elect to "sell" certain receivables to Silo that were owed to the Supplier by an "Obligor," but only on the condition that the Obligor had been approved by Silo as an "Eligible Obligor."  Supplier Receivables Agreement ("SRA") at § 1. If Silo made such a determination, then Silo would "offer" terms to purchase the receivables in question from Supplier at a discount from their face value, but — as shown below — subject to continuing obligations of Supplier to compensate Silo for any shortfall in Silo's collection efforts against the Obligor.

21.     Under the terms of the program, in exchange for the financing provided to Supplier, Silo would collect the face value of the receivable subject to certain "Adjustments" from Obligor ("generally" without providing notice to the Obligor of the transaction), but while making no effort, and having no obligation, to undertake any "collection activities" against the Obligor.  *See* SRA § 5.  From a collections perspective, all that Silo was contractually required to do was to "direct" to Supplier where "all payments made" on the receivables should be sent.  Supplier, by contrast, was required to immediately inform Silo if it became aware of any grounds

[9] Crunchbase, *Silo - Funding, Financials, Valuation & Investors (last accessed Jan. 3, 2025).*

on which an Obligor may not make timely payment when the receivable is due (i.e., the "Maturity Date"), in addition to forwarding all collections that Supplier received on the receivables to Silo.

22.     For this right to collect receivables in its payment account, Silo would provide the following terms of financing to Supplier:  Supplier would receive payment of a specially-defined discounted purchase price (the "**Purchase Price**") via two "payments," but one of which was certain.  The first payment — the "**Upfront Purchase Price**" (defined as "Net Face Value[10] [NFV] minus Reduction Reserve [variable, but stated as 10% of NFV]") — would be paid to Supplier on the date of purchase.  (Assuming a 10% reduction reserve as stated in the SRA, Supplier would receive 90% of NFV at the time of purchase.)  The second payment — the "**Deferred Purchase Price**" — was more illusory; it is defined as the "Reduction Reserve" (10% of NFV) "minus" a "Transaction Fee" paid by Supplier that, in the case of Dasagroup, was quoted as 2% of NFV.  *See* SRA § 2.

23.     While the amount of the Deferred Purchase Price could be calculated in theory, there was no commitment that the Supplier would actually be paid this amount, even on a deferred basis.  Instead, when the receivable came due (the "Maturity Date" of the receivable, also referred to as the "Deferred Purchase Price Payment Date"), Silo's theoretical payment of the Deferred Purchase Price at maturity would be adjusted by — and potentially fully offset by — what was essentially the shortfall between the face value of the receivable and actual amounts collected by Silo from Obligor.  *See* SRA § 3.[11]  If Silo collected more on the receivable than what it had held back as the reduction reserve, then Silo would be obligated to only pay Supplier for what referred to as the "Reduction Reserve Surplus" (that quantity calculated as the

---

[10] The Net Face Value ("NFV") of a receivable is defined as "the face amount of the Receivable, net of any Adjustments (other than the Reduction Reserve) specifically taken into account in determining the Purchase Price" at the time of purchase.  *See* SRA § 2.  Separately, an "Adjustment" is defined as "any discount, adjustment, deduction, or reduction that would have the effect of reducing the final amount of part or all of such Receivable (except, in each case, to the extent resulting solely from an Insolvency Event of the applicable Obligor or the financial inability of the Obligor to pay such Receivable)." *Id*. § 27.

[11] This calculation is more complex than stated.  Under the agreement, the "Actual Reduction Amount" is calculated as the greater of (i) all other Adjustments made to the receivable (other than the adjustments initially considered for calculating NFV) and (ii) any "Repurchases" of the receivable required by Section 8.  *See* SRA § 3.

---

DEFENDANT DASAGROUP HOLDING CORP.'S FIRST AM. THIRD-PARTY COMPLAINT

difference between the reduction reserve and the shortfall (i.e., the "Actual Reduction Amount")) less another 2% Transaction Fee on the total face value of the receivable. *Id*. Alternatively, if Silo collected less on the receivable from the Obligor than what it had held back as the reduction reserve, then Supplier would be liable to pay Silo for that difference, which was calculated under the agreement as the "Reduction Reserve Deficit," in addition to the 2% Transaction Fee. *Id*. If Supplier was unable to timely pay this Reduction Reserve Deficit — or any other amounts owed to Silo under the agreement — then Supplier would be assessed "Late Fees" under Section 6 of the SRA.

24. The Late Fees to be assessed against Supplier were as follows: (i) if any late payment is received within 30 days of the Maturity Date, then the late fee would be calculated as the Transaction Fee [here, 2% of NFV] plus an additional 0.5% of NFV; and (ii) if any late payment is received more than 30 days after the Maturity Date, then the late fee would be calculated as the Transaction Fee [here, 2% of NFV] plus an additional 1.5% of NFV. SRA § 6.[12] Nothing in section 6 of the SRA (or elsewhere) indicates that these late fees were intended to be anything but a penalty to the Supplier for late payment. Nothing in the SRA indicates that these late fees were commercially reasonable, approximated costs difficult to estimate, or that they were a reasonable estimate of actual damages caused by any late payment, much less why a payment received on the 31st day after maturity warranted 1.5% on top of the transaction fee ("Transaction Fee + additional 1.5%"), as opposed to a 0.5% fee charged on the same payment one day earlier ("Transaction Fee + additional 0.5%"). This is especially true when the "Transaction Fee" could vary between customers, on a customer-by-customer basis, and, in the case of Dasagroup, was assessed at 2%, which, in and of itself, is a substantial charge that would always be assessed for any payments assessed one day after the "maturity" of a factored receivable (i.e., the date when payment is due to Supplier from an Obligor).

25. While the overall payment structure of the SRA appears to have mitigated Silo's risk of nonpayment by Obligor on the receivables at issue, nothing in the Agreement required Silo to refund to Supplier any further portions of the reduction reserve or make any other

---

[12] These same Late Fee provisions were expressly incorporated into the later Forbearance Agreement with Plaintiff Jefferies, with additional provisions operating as a potential forfeiture in the event of late payment. *See* Dkt. 1 (Jefferies Compl.) at Exh. C § 4.3 (Forbearance Agmt.).

payments to Supplier.  The document did, however, contain a separate provision that ran the other way, requiring Supplier to make Silo whole in the event of further "Adjustments" to Purchased Receivables by the Obligor.  *See* SRA § 7.  That provision stated that "[i]f . . . an Obligor makes any reduction or adjustment to, or takes or retains any credit in respect of, the amount of a scheduled payout in respect of a Purchased Receivable [following the Purchase Date] (including any setoff, recoupment, or other fee or charge) (each, an 'Adjustment'), the Supplier will be deemed to have received on such day a Collection in respect of that Purchased Receivable in the amount of Adjustment the and must pay the amount of that Adjustment to Silo." *Id.*

26.     A separate provision (at SRA § 13) gave Silo the right to demand repurchase of any particular receivable upon a "Repurchase Event," which would be deemed to have occurred "if (i) any representation or warranty made by Supplier in Section 12 with respect to such Purchased Receivable shall be inaccurate, incorrect or untrue on any date as of which it is made or deemed to be made; or (ii) Supplier confirms or issues a refund to the applicable Obligor for, or accepts a return of, the goods and/or services whose sale gave rise to such Purchased Receivable."  SRA § 8.  As benign as that provision may have seemed, a review of the representations and warranties stated in Section 12 and covenants listed in Section 13 of the SRA show that the agreement was weaved with tripwire *ab initio*.  Several of the enumerated items in those sections would have been problematic for *any* produce seller covered by PACA and the statutory trusts that automatically arise by operation of law upon the sale of perishable produce. *See* SRA § 12 (rep and warranty re: purchased receivables being "free and clear of any and all liens, charges, attachments or security interests" and will be paid without defenses, offsets, or other rights of return); *id.* § 13 (covenant that Supplier would not "create, incur, assume, or permit to exist any lien upon or with respect to any Receivable now owned or hereafter acquired by Supplier").[13]

27.     The only apparent situation in which Silo agreed to expressly bear an Obligor's credit risk was in the event of a reduction "resulting *solely* from an Insolvency Event [undefined]

---

[13] Any produce seller covered by PACA who factored invoices through the Silo Instant Pay program would have been vulnerable to an immediate Repurchase Event by virtue of the PACA statutory trust arising by operation of law when perishable produce is sold.

of the applicable Obligor or the financial inability of the Obligor to pay such Receivable." *Id.* §

27 (definition of "Adjustment") (emphasis added). While nothing in the remaining terms of the

Agreement stated that a Supplier would be required to pay to Silo the full amount of any unpaid

invoice if not fully paid by an Obligor, it is what Silo expected and routinely charged to

participants like Dasagroup. It is also what Silo told customers in their online FAQs about the

Instant Pay Program:

> **What happens if my customer pays late? What if they don't pay at all?**
>
> If your customer does not end up paying the invoice, you will still be responsible for reimbursing
> Silo for the balance owed. This will occur with the scheduled repayment at the expected
> payment date. Silo's payment processing and reconciliation service will still process customer
> payments even if Silo has already been reimbursed for the funded invoice.

See Blog Post: *It's Your Cash. Put it to work: Silo Instant Pay FAQs* published by Silo

Technologies, available at: https://usesilo.com/blog/its-your-cash-put-it-to-work.

      28.    Even though the arrangement did not transfer credit risk to Silo, Section 17 of the

Master Services Agreement stated that the parties agreed that the factoring arrangement was

intended to be a "true sale" of the receivables to Silo, and that, to avoid a court deeming it

otherwise, the Supplier (here, Dasagroup) granted Silo a security interest in *only those*

*receivables factored under the program*:

> 17. Security Interest in Purchased Receivables
>
> The parties hereto agree that each purchase and sale of Receivables under this
> Agreement is intended to be an absolute and irrevocable transfer constituting a
> "true sale" for bankruptcy law purposes, without recourse by Silo to Supplier for
> any credit risk or financial inability to pay of any Obligor. The parties hereto have
> structured the transactions contemplated by this Agreement as a sale, and each
> party hereto agrees to treat each such transaction as a "true sale" for all purposes
> under applicable law and accounting principles, including, without limitation, in
> their respective books, records, computer files, tax returns (federal, state and
> local), regulatory and governmental filings (and shall reflect such sale in their
> respective financial statements). Supplier will advise all persons inquiring about
> the ownership of the Receivables that ***all Purchased Receivables*** have been sold
> to Silo. Against the possibility that, contrary to the mutual intent of the parties, the
> purchase of any Purchased Receivable is not characterized as a sale by any
> applicable court, Supplier hereby grants to Silo a security interest in, and right of
> setoff with respect to, all of the Purchased Receivables and all proceeds thereof to
> secure the payment and performance of Supplier's payment and performance

obligations hereunder. The grant of each security interest herein is a supplemental protection to Silo and is not meant to negate or affect in any way the intended sale of the Purchased Receivables by Supplier to Silo and the fact that the parties intend for the Purchased Receivables to be assets of Silo. Silo is hereby authorized to file UCC financing statements with respect to the transactions contemplated hereunder, including the security interests granted herein, together with any continuations and amendments relating thereto.

SRA § 17 (emphasis added).

29.     Unbeknownst to Dasagroup, there were several additional problems with the SRA and the specific provisions referenced above.  When Dasagroup entered into its contract with Silo, there was no legitimate business justification for the excessive charges, transaction fees, and late fees assessed under the SRA.  These fees were not commercially reasonable, were disproportionate to the actual costs incurred by Silo related to those provisions, and did not bear any reasonable relationship to the range of actual damages that the parties could have anticipated would flow from any late payment or other breach of the agreement.  For instance, the late fees under section 6 — which was expressed as a sum of an escalating percentage (0.5% or 1.5%) *plus* the standard "Transaction Fee" (2% in the case of Dasagroup) — were not reasonable under the circumstances at the time Dasagroup entered into to the Instant Pay contract, and they bore no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a late payment.  As such, they are invalid contractual penalties under California Civil Code § 1671(b) and, for reasons described *infra*, violate the state prohibition on usury. Even as to the Transaction Fee itself, which was negotiated in Silo's discretion from supplier to supplier under the Instant Pay Program, there was no justification for the 2% transaction fee assessed on Dasagroup's factored receivables and on further payments made under the program; any such fees were unlawful, unconscionable, and disproportionate to the actual costs incurred with processing any such payments.

30.     The effective result of this documentation was that Silo had created a lending program that masqueraded as a factoring arrangement but without transferring the Obligor's credit risk to Silo.  And it made misleading statements to prospective customers when advertising the benefits of its program.  For instance, in its website marketing materials promoting the program to prospective borrowers like Dasagroup, Silo advertised that the

financing it provided through the Instant Pay Program was superior and more cost affordable than traditional accounts receivable financing, which it contrasted as follows:

> . . . This article will act as a learning guide to teach you about what accounts receivable factoring entails, the cost of it, and what other alternative lending funding structures exist to ensure strategic management and long-term success for your business.
>
> **What is accounts receivable factoring?**
>
> When businesses are strapped for cash and are in need of money faster than customers can pay their bills, they might consider accounts receivable factoring. In practice, the business would sell at least one invoice to a lending company for an advance payment. In exchange for quick payment, businesses will have to pay a fee.
>
> Some view it as useful for bridging cash flow gaps, though this finance option is a more expensive method of lending.
>
> Plus, if a distributor cannot pay, it's common for factoring companies to go after a business' customers. This is less than ideal, as it can cause reputational damage that prevents other businesses from wanting to work with them.
>
> Regardless, accounts receivable factoring is not technically considered a loan. Although businesses that don't traditionally qualify for bank loans based on poor or short credit history may opt for it (i.e., businesses that aren't a large corporation), it's generally seen by most businesses as a funding method that has many downsides.
>
> . . .
>
> **Is accounts receivable factoring the best option?**
>
> Oftentimes, no, accounts receivable factoring is not what's considered the most optimal. While it may provide your business with temporary cash relief, there are some huge disadvantages of using the service that you need to know.
>
> First, it can be a very expensive business accounting process, where fees typically range from 1 to 5% each month. Also, if you agree to recourse factoring, you'll be on the hook for a customer's unpaid invoice.
>
> Second, the fee structure is entirely dependent on the customer—the longer they wait to pay their invoice, the heftier fees you'll be charged. This can make it difficult to make a payment plan and informed business decisions about the future.

---

DEFENDANT DASAGROUP HOLDING CORP.'S FIRST AM. THIRD-PARTY COMPLAINT

Third, if you're operating in an industry like the produce supply chain where healthy business partnerships are highly valued, having an external third party act as a collector can create the risk of straining your relationships. It means, to some extent, relinquishing control.

*In the worst case scenario, it can significantly damage your business' reputation and cause long-term losses.*

**Alternative financing emerges as a solution**

Traditional lending strategies and invoice factoring are not your only two options when your business needs working capital. Consider Silo Capital for your go-to alternative financing solution, particularly when your business hits a rough patch that increases your credit risk or prevents you from securing a line of credit or loan from a bank.

Instead of seeking help from a bank that requires collateral or forces you to commit to a rigid contract with strict obligations, you can rely on Silo to provide you with flexibility, security, cost-effectiveness, and a range of options that help you out of a bind.

Silo has partnered with small and medium-sized businesses like yours to inform our products. Large banks have dominated access to funding for far too long, giving businesses like yours no option but to pay outrageous fees tied to inflexible terms and conditions (fees best suited for a large corporation). Silo has since stepped in to provide distributors like you with a tailored financial product that gives you more purchasing power and control over your business.

With Silo Capital, your small business doesn't have to stress over customers paying their invoice. Silo Instant Pay allows your business to receive 90% of the invoice amount in only 3 days, and unlike other solutions, repayments are flexible.

The reason Silo works so well is that your business can maintain total control over customer communications, have 100% funding transparency, and have clear repayment schedules so your business can plan ahead.

Silo Cash Advance encourages strategic investments to support your business operations. Don't wait for a bank to approve a loan. Instead, invest in time-sensitive opportunities, diversify product lines, secure stable supplier relationships, and vertically integrate your business to promote lower costs or launch a rebrand.

With flexible funding options at hand, your business can bridge cash flow gaps so you can keep your business going and growing.

Book a demo with Silo today!

**Exhibit A** (Blog Post: *Silo: A Better Alternative to Accounts Receivable Factoring*, available at: https://usesilo.com/blog/silo-a-better-alternative-to-accounts-receivable-factoring (emphasis added).

31. These statements were false and misleading because they implied that the alternative financing products offered by Silo were of a different quality and character than the accounts receivable factoring contrasted in the article. These untrue, deceptive and/or misleading statements included the following:

     a.     that accounts receivable factoring was a more expensive method of lending;

     b.     that, if a distributor cannot pay, it is "common" for factoring companies to "go after a business' customers";

     c.     that accounts receivable factoring "is not technically considered a loan";

     d.     that Silo's alternative financing arrangements were less costly than factoring, under which fees typically range from 1% to 5% per month;

     e.     that, in contrast to factoring, the fee structure of Silo's alternative financing arrangements were not dependent on the obligor's delay in paying on the receivables owed and that "heftier fees" would not be charged the "longer [customers] wait to pay their invoice";

     f.     that, in contrast to recourse factoring, Silo's alternative financing arrangements would not place a supplier "on the hook for a customer's unpaid invoice";

     g.     that, in contrast to factoring, Silo's alternative financing arrangements would allow Instant Pay participants to maintain "total control" over their client communications and avoid financiers "act[ing] as a collector";

     h.     that, in contrast to factoring, Silo's alternative financing arrangements would allow Instant Pay participants to avoid the risk of "straining [customer] relationships," "damag[ing] [their] business reputation," and "caus[ing] long term losses";

     i.     that, unlike "a bank that requires collateral or forces [one] to commit to a rigid contract with strict obligations," participants in Silo's alternative financing arrangements

---

DEFENDANT DASAGROUP HOLDING CORP.'S FIRST AM. THIRD-PARTY COMPLAINT

*Jefferies Funding v. Dasagroup Holdings et al.*
No. 3:24-cv-05639-SK

"can rely on Silo to provide . . . flexibility, security, cost-effectiveness, and a range of options to help . . . out of a bind";

        j.     that participants in Silo's alternative financing arrangements do not have to "stress over customers paying their invoice";

        k.     that participants in Silo's alternative financing arrangements "can bridge cash flow gaps so [they] can keep [their] business growing and growing"; and

        l.     that "Silo Instant Pay allows your business to receive 90% of the invoice amount in only 3 days, and unlike other solutions, repayments are flexible."

32.     Many of these untrue, deceptive and/or misleading statements about the Instant Pay Program — i.e., statements about its fees, flexibility, patience with customer collections, non-interference with customer communications, and willingness to extend credit to bridge cash flow gaps — were similar, if not identical, to the same alleged benefits that Silo's representatives Jeff Butler and Alex Archer touted directly to Dasagroup to induce the company to enter into the Instant Pay Program. At the time these and other statements were made to Dasagroup and other prospective customers, Silo's representatives knew that these statements were untrue, deceptive and/or misleading, and they knew that these were matters of importance to customers like Dasagroup.

33.     These statements were, indeed, important to Dasagroup, and Dasagroup acted in reliance on how Silo represented it would act toward Dasagroup as a new financier. Dasagroup entered into the Silo Instant Pay program in reliance on Silo's statements that (i) Silo would not interfere with Dasagroup's customer relationships; (ii) Silo would be flexible on payments arriving from Dasagroup's customers on any pertinent receivables; (iii) Silo's Instant Pay funds could be for Dasagroup's cash flow gaps so it could keep growing its business; (iv) Silo would avoid acting as a collector on invoices; (v) Silo would work with Dasagroup on delayed payments by Dasagroup's customers and would work with Dasagroup to credit or reverse any late fees and/or disputed charges as appropriate; and (vi) Silo would act with flexibility on a repayment schedule and that repayments would be flexible to help Dasagroup out of any difficulties it may encounter in its operations.

34.     While the parties' initial course of dealing did appear to match this understanding, Silo abruptly changed course in the spring of 2024 when it appears to have defaulted on a credit facility that it and/or one of its affiliates owed to Plaintiff Jefferies.  At all relevant times, Silo knew that Dasagroup was a purveyor of avocados and was one of several competing purveyors of avocados who participated in the Instant Pay Program (one of which was featured prominently on Silo's website).

**D.  Under The Course of Dealing that Developed Between Silo and Dasagroup, Silo Understood that Dasagroup Was Using Funds Obtained via the Instant Pay Program For Working Capital to Pay Suppliers and Grow Its Business.**

35.     For the course of the parties' relationship under the Instant Pay Agreement and during a period when Dasagroup had been misled about Silo's interpretation of the Instant Pay contract and its anticipated course of dealing under the program, Dasagroup received funds as advances on accounts receivables under the Agreement and made payments on the loans incurred in accordance with the terms of the Instant Pay Agreement, as it had been understood by Dasagroup in light of Silo's representations about the way the program worked and how it would operate as Dasagroup's financier.

36.     Dasagroup was a solid participant in the program.  For almost two years, Dasagroup factored certain receivables (but not all receivables) owed by its then-largest customer under the Silo Instant Pay Program and used the funds received to grow its business and use the profits of those efforts to pay down its balance owed to Silo.  Over the course of the parties' relationship, Dasagroup made payments of more than $5.5 million dollars to Silo to repay credit that had been extended through the program.  The volume of factored invoices was initially small but grew over time as Dasagroup's business improved through the use of the Instant Pay Program.

37.     During this time, Dasagroup and Silo developed a course of dealing whereby Silo acted with flexibility toward Dasagroup and encouraged the company to grow its business through the program.  Because the volume of Dasagroup's transactions had increased significantly, Silo acted with flexibility toward Dasagroup and did not demand immediate payment of all amounts due under the program on unpaid receivables.

38. During this time, Silo also encouraged Dasagroup to use the company's AI platform for order processing and inventory management, but Dasagroup chose not to do so to avoid disrupting its existing systems and course of dealing with its customers. Silo accommodated Dasagroup in this respect and did not demand that it only use its platform for its operations. In addition, Silo also encouraged Dasagroup to factor other invoices owed by Dasagroup's other customers, but Dasagroup chose not to do so, and Silo also accommodated that decision.

39. Everything abruptly changed in early April 2024 when Alex Archer of Silo called Dasagroup to inform Dasagroup that it had encountered "difficulties" with "its [Silo's] lender" and could no longer extend credit to Dasagroup under the program. This was the first time that Dasagroup was informed that Silo had a lender and that the funds extended to it were funds that Silo owed to another party. At the time, Mr. Archer asked if Dasagroup could make payments on its account, but assured Dasagroup's CEO that Silo was likely to work out its issues with its lender and that its participation in the program would likely resume.

40. Ultimately, that did not occur for reasons beyond Dasagroup's control. Silo did not reinstate Dasagroup's participation in the program and, upon information and belief, also shut down other purveyors' access to the Instant Pay Program. By February 2024, Dasagroup's largest customer, London Fruit, had owed a $3.5 million balance to Dasagroup on unpaid receivables and significantly delayed payments on Dasagroup's receivables. Upon information and belief, London Fruit's new parent company, Grubmarket, had taken over London Fruit's operations and was using London Fruit's operating cash for other purposes, to the exclusion of debts owed to suppliers like Dasagroup. Dasagroup attempted to explain the situation to Silo and committed to paying on its account as soon as possible.

41. During this time, Dasagroup informed Silo that it was unable to meet its payment schedule under the Agreement and gave assurances to Silo that it would satisfy its payment obligations. At the time, section 26 of the Silo Instant Pay Contract contained a broad *force majeure* clause which stated, "Neither Party shall be liable for failure to perform or for delay in performance due to fire, flood, strike, or other labor difficulty, act of God, act of any governmental authority, riot, embargo, fuel or energy shortage, wrecks or delays in

transportation, inability to obtain necessary labor, or materials from usual sources, or due to any cause beyond either Party's reasonable control ('Force Majeure Event')." Nevertheless, Silo charged Dasagroup for London Fruit/Grubmarket's non-payment of the factored Instant Pay receivables. In addition, Silo and its newly-disclosed lender, Plaintiff Jefferies, threatened Dasagroup with a lawsuit and a demand for accelerated payments of its entire obligation. These amounts demanded included the money allegedly owed on these receivables from London Fruit.

42. In late April 2024, Dasagroup was introduced to representatives of Silo's silent lender, Plaintiff Jefferies, to whom Silo represented it had assigned its payment interest on the debt owed by Dasagroup and demanded additional information about the existing debt to Dasagroup owed by London Fruit. On a conference call with Silo, Jefferies immediately threatened to sue Dasagroup and demanded an explanation as to why payments had not been made. In response, Dasagroup told Jefferies about the amount owed by London Fruit, what it knew about London Fruit and Grubmarket's delayed payments, and told them that they should be accommodating in awaiting payment to allow Dasagroup's business to continue and generate more cash that could be used to pay down the balance. At this time, Plaintiff Jefferies learned of the existence of the contract existing between Dasagroup and London Fruit, including the existence of various receivables owed by London Fruit on non-factored invoices for prior deliveries of avocados made by Dasagroup. Dasagroup also told Jefferies that it intended to pursue other business opportunities in the meantime with its other existing customers, one of which names was disclosed to in passing.

43. Based on that information and to maximize leverage in the situation, Silo and Jefferies, acting in concert and with the authorization of each other, threatened to immediately sue Dasagroup and its existing customers if it did not reach an immediate payment plan to repay the debt owed to Silo. They demanded immediate payment on all factored receivables and threatened to take legal action against *Dasagroup and all of its customers* to force Dasagroup to immediately pay amounts owed, even if any income Dasagroup received from other customers or other non-factored receivables was earmarked to pay suppliers it owed for its prior deliveries of produce. Silo and Jefferies, acting in concert, sent a proposed forbearance agreement with an onerous payment schedule for Dasagroup to review.

44. While the terms of a possible forbearance agreement were being negotiated in early May 2024 among the parties, Silo and Jefferies, acting in concert and with the authorization of each other, decided to showcase the severe economic harm they could cause Dasagroup by ruining its business and its customer relationships. In a bold flex intended to scare Dasagroup into entering into an onerous payment schedule under a forbearance agreement, Silo and Jefferies improperly contacted London Fruit and the one other Dasagroup customer that had been previously disclosed to demand that Dasagroup's customers remit all further payments of monies directly to accounts controlled by Silo, even though the payments demanded were either not factored through the Instant Pay Program or included other invoices that were not factored under the program. These acts included service of a fraudulent Notice of Assignment on Silo letterhead, signed by Jeff Butler, that falsely announced that Dasagroup had entered into a financing agreement with Silo; that Silo had been granted a security interest in "all" of Dasagroup's factored receivables; that the terms of financing "require that payments on all accounts receivable be made to Silo"; and that directing that the recipient "make payment on all accounts receivable and all other amounts owing to Kickhass Avocados." These statements were false when made, especially with respect to a claim on "all" accounts receivable.

45. Because many of the recipients' accounts receivable were not factored under the Silo Instant Pay Program (one of which customers had no invoices factored whatsoever), neither Silo nor Jefferies held a valid security interest in those accounts receivable under the terms of the Instant Pay Program or any other agreement. In addition, Dasagroup refused to signed any written assignments of collection to Silo or Jefferies.

46. Despite having no valid enforceable security interests in all of Dasagroup's accounts receivable, Jefferies took intentional and wrongful action to initiate contact with London Fruit and at least one other customer of Dasagroup to claim that it held a security interest in all of Dasagroup's accounts receivable (including non-factored receivables) and demanded that any invoices to be paid by those customers to Defendant/Counterclaimant be paid directly to accounts under the control of Jefferies and/or Silo. Upon information and belief, Jefferies and Silo, acting in concert, did this by misinforming these other customers that they held a security interest in all of Defendant/Counterclaimant's accounts receivable, which was not true. They

knew that it did not hold a security interest in all of Defendant/Counterclaimant's accounts receivable, but made these misstatements anyway to induce the recipients to pay Silo instead of Dasagroup on debts owed and to deprive Dasagroup of payments for prior deliveries of produce already made.

47.     In taking this action, Plaintiff Jefferies acted maliciously, fraudulently and oppressively, and with the wrongful and deliberate intention of injuring Defendant/ Counterclaimant and benefiting themselves to Dasagroup's detriment, in addition to acting with an improper motive amounting to malice and conscious disregard of Dasagroup's rights.

48.     More importantly, Jefferies and Silo took this action to cause Dasagroup to agree to the forbearance agreement under severe economic duress, which they ultimately accomplished.  Both Silo and Jefferies made a threat (and also carried out a threat) to assert rights that neither of them legally had; they did this via fraudulent and deceptive communications to Dasagroup's existing customers; and they effectively prevented Dasagroup from exercising its free will, agency and judgment in deciding to enter into the onerous Forbearance Agreement that it ultimately signed to prevent further harm to its business and reputation.

49.     At the time Dasagroup acquiesced to Jefferies and Silo's demands to sign the Forbearance Agreement, Dasagroup had no reasonable alternative but to comply with their onerous demands, lest its business be destroyed completely by further improper communications sent to its customers and threats to embroil them in litigation, even in the absence of any right to collect against them on non-factored receivables.  Under severe economic duress this — to avoid litigation against it and its innocent customers, to avoid further improper claims against its customers, and to avoid the destruction of its business — Dasagroup agreed to a Forbearance Agreement with Silo and Plaintiff Jefferies,.

50.     The terms of the Forbearance Agreement were unlawful and incorporated various significant fees and other charges of the SRA (including transaction fees and late fees).  It required that Dasagroup meet an onerous payment schedule totaling over $3,000,000 over a series of months and assessed late fees "as calculated pursuant to Section 6 of the Sale Agreement" if Dasagroup was delayed in paying any installment, plus an additional 3% monthly

financing charge for any payment deficiencies under the schedule. These provisions are punitive in nature and operate as an unlawful forfeiture.

**E. When One of Dasagroup's Customers Defaulted on Its Receivables, Dasagroup Could Not Keep Pace With All Amounts Demanded by Silo Under the Program, Including The Amounts Allegedly Owed On Its Customer's Unpaid Invoices.**

51. Kickhass sold produce to Co-Defendant London Fruit, Inc., which produce was delivered to London Fruit with a promise to pay for the items delivered. As stated previously, in early 2024, just months after London Fruit was sold to Grubmarket, it began to underpay on payments due to Dasagroup and, months later, eventually stopped paying altogether.

52. Dasagroup made considerable efforts at payment after signing the Forbearance Agreement while still attempting to collect from London Fruit. Dasagroup made repeated payments of well over $100,000 on multiple occasions, but it was never enough for Jefferies, who assessed further improper interest charges, late fees, and forfeitures, in addition to declaring other rights of acceleration under the Forbearance Agreement. During this time, Jefferies also began to demand information from Dasagroup, including sensitive business information about its business and operations. Some of this information was shared in redacted format under an agreement between the parties that any such confidential business information provided to Jefferies would remain private and confidential. During this time, Dasagoup again reiterated to Jefferies that it had not been paid significant amounts by London Fruit, who Jefferies came to learn was Dasagroup's biggest customer and had received shipments of produce after Silo had terminated Dasagroup's participation in the Instant Pay Program.

53. After learning this, Jefferies initiated this lawsuit against Dasagroup and London Fruit, even though Jefferies had no claim on non-factored invoices (especially those invoices for produce delivered in July 2024 and thereafter). After being sued in this action, London Fruit stopped doing all business with Dasagroup entirely and stopped paying on all outstanding invoices, thereby collapsing Dasagroup's business entirely, from which it has yet to recover.

**F. Unbeknownst to Dasagroup, Silo Was Not Licensed in California to Conduct Commercial Lending Activities.**

54.     At all relevant times under the Instant Pay Program, Dasagroup was not aware that, among other things, Silo loaned third party funds, was not sufficiently capitalized to carry out its business, and was not licensed to provide the financing services contemplated by the Instant Pay Program.

55.     Upon information and belief Plaintiff Jefferies Funding LLC is one of several financial partners who provided funding for Silo's lending program.  Upon information and belief from public sources, Plaintiff had extended a $100 million secured credit facility that was used by Silo to extend problematic loans to participants in the perishable produce industry like Dasagroup.

56.     Unbeknownst to Dasagroup and other participants in Silo's Instant Pay Program, the loans provided to them by Silo in exchange for their factored receivables were paid by funds that Silo procured from its financier Jefferies, and not from funds raised by or belonging to Silo itself.  Also unbeknownst to Dasagroup was that (i) Silo was an unlicensed lender with respect to the Instant Pay Program and was not properly licensed to provide the financing services it extended to Dasagroup (and others), and (ii) Jefferies — one of the sources of funds used by Silo to finance Dasagroup's factored receivables — was a silent lender whose parent company, Jefferies Financial Group, was a conflicted investor in Silo.

57.     Dasagroup has also learned of the following concerns relating to Silo, all of which are imputed to Plaintiff Jefferies as the alleged successor in interest of Silo's rights under the Agreement, and none of which were disclosed to Dasagroup before or during the period it was factoring receivables through the Instant Pay program:

a.     Silo did not have capital sufficient to fund its loans and that Silo was essentially an intermediary providing third party funds (including Plaintiff Jefferies's funds) to its clients like Defendant/Counterclaimant Dasagroup;

b.     Silo does not hold or maintain a license under California Financing Law to operate as a finance broker or finance lender and, therefore, is not authorized to make or broker commercial loans;

c.     Silo knew or should have known that it was required to obtain and

---

DEFENDANT DASAGROUP HOLDING CORP.'S FIRST AM. THIRD-PARTY COMPLAINT

*Jefferies Funding v. Dasagroup Holdings et al.*
No. 3:24-cv-05639-SK

maintain a finance lender and/or finance broker license under California Financing Law and knowingly and willfully failed to obtain said licensure;

      d.   Silo structured its business and contracts in such a manner as to disguise or conceal the fact that it operated as the public facing member or participant of "table lending" program targeting, *inter alia*, the fresh produce industry;

      e.   The money Silo be paid to Dasagroup and others as part of the factoring arrangement under the Instant Pay Program would originate from Jefferies, whose ultimate parent, Jefferies Financial Group, was owned in part by Blackrock, Inc., a private equity firm that was a key investor in Silo's direct competitor, Grubmarket, Inc. At no time was Dasagroup informed of Jefferies's conflict of interest — i.e., that it was extending credit to Silo while its parent company's 7.5% owner, Blackrock (the largest or second-largest shareholder in Jefferies Financial at the time), had a considerable ownership stake in Grubmarket via at least two rounds of disclosed financing. At no time, however, was Dasagroup informed that the credit terms, approvals, repayment policies, or exercise of payment rights and obligations under the Silo Instant Pay Program could be influenced by Jefferies's conflict of interest — i.e., exercised in such a way that would benefit Silo's direct competitor, Grubmarket, rather than Silo itself and loyal clientele like Dasagroup.

      f.   There was a considerable risk that Dasagroup's most sensitive and critical business information it intended to share with Silo —i.e., competitive intelligence about Dasagroup's pricing, suppliers, and customers — could possibly be shared with a financial institution beholden to the interests of Silo's direct competitor, Grubmarket, who fatefully purchased Dasagroup's then-largest customer, London Fruit, Inc., a Texas-based wholesaler that was recently acquired by Grubmarket, Inc., which has its principal place of business in San Francisco, California.

    58.   On information and belief, under the foregoing arrangement Silo provides third party funds and is not sufficiently capitalized to carry out its business and the following sequence of events took place between one of Silo's borrowers:

      a.   Upon information and belief, Silo's commercial lending services operated in a manner similar to a "table lending" or "table funding" program

---

wherein Silo would originate loans for which it did not have sufficient capital to fund. Instead, Silo had a financial arrangement with other or larger lenders or investors to provide capital necessary to fund the loans Silo originated for the benefit of itself and the members of its "table lending" program.

b.  Upon information and belief, beginning in January of 2024, Silo began to lack adequate capitalization to operate under its written lending agreements, which provided ongoing lending or cash advance obligations on the part of Silo, and it was unable to sustain any losses resulting from its inability to collect upon its own accounts receivable or loan debt.

c.  Upon information and belief, in April of 2024, Silo provided one of its clients with multiple email notices regarding "an expected situation that has temporarily affected our banking system" and similar statements regarding Silo's inability to access or provide funding to its customers.

d.  In May of 2024, TechCrunch published an online article that reported that Silo had difficulty collecting a loan from one of its customers and this caused Silo's bank to pause the loan product.

59.  Upon information and belief, due to Silo's inability to manage its own operations, exemplified by its lack of proper licensing to carry out its primary business, makes all prior agreements executed with Kickhass unlawful and voidable at Kickhass's prerogative and to the extent alleged here.  Among other things, Silo, with Plaintiff Jefferies as its silent lender, was acting as an unlicensed lender toward Dasagroup in connection with the Silo Instant Pay Program, and charged Dasagroup with interest, fees, and penalties that, individually and collectively, exceeded the maximum rate permitted under the California state constitution prohibition on usury found at Cal. Const. Art. XV, § 1(2).

60.  Unaware of the foregoing, Kickhass entered into a Forbearance Agreement ("Forbearance") with Plaintiff and Silo on or about June 19, 2024 for the amounts that Plaintiff claimed were owed under the Supplier Receivable Sales Agreement with Silo, an unlicensed finance lender.  In negotiating the Forbearance, Plaintiff Jefferies improperly attempted to secure

a contractual agreement from Dasagroup to pay the invalid late fees and other charges under the SRA that violated the Civil Code § 1671(b) and the California state constitutional prohibition on usury.

61.     In addition to containing overbroad and unlawful waivers of rights that are void as against public policy, the terms of repayment under the Forbearance are onerous, and contain liquidated damages that are punitive in nature in violation of California Civil Code § 1671(b).

62.     In entering the Forbearance with Kickhass, Plaintiff and Silo coercively demanded the inclusion of a waiver of all claims or threatened litigation.

63.     Some time after execution of the Forbearance, Co-Defendant London Fruit, Inc. ceased doing business with Kickhass Avocados and refused to pay outstanding invoices owed.

64.     Kickhass was unable to satisfy the repayment schedule found in the Forbearance and informed Plaintiff, who has since initiated this lawsuit.

65.     Kickhass therefore brings this Third-Party Complaint for the claims asserted below against Silo Technologies, Inc.

**FIRST CLAIM**
**Declaratory Relief**
(***Against Silo Technologies***)

66.     Kickhass re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 26 as if fully set forth herein.

67.     An actual, present, and justiciable controversy has arisen between Kickhass and Silo concerning their respective rights under their contractual agreements, including but not limited to the Supplier Receivable Sales Agreement, Forbearance Agreement, and any and all payments made under those agreements to Silo and Plaintiff.

68.     Under Civil Code § 1689 and other applicable law (including laws governing unlicensed commercial lenders), Kickhass is entitled to a declaration that they may rescind the Supplier Receivable Sales Agreement.

69.     Kickhass seeks rescission of both Supplier Receivable Sales Agreement and the Forbearance Agreement pursuant to Civil Code § 1689 because of one or more of the following: (i) Kickhass's consent to those agreements was obtained through duress, menace, fraud, or undue influence; (ii) if the consideration for the obligation of Kickhass fails in a material respect from

any cause; (iii) the contracts are unlawful for causes which do not appear in their terms or conditions, and the parties are not equally at fault (including specific violations of California state law); and/or (iv) because the public interest will be prejudiced by permitting the Agreements to stand.

70.     In addition, the Supplier Receivable Sales Agreement appears to be one-sided and illusory.  The plain language of the Supplier Receivable Sales Agreement document provides no remedy whatsoever for Kickhass in the event that Silo breaches the agreement or any associated agreement, or commits any other tort or violation of the law in connection with its performance (or nonperformance) of the lending agreement. As such, Silo is at liberty to decide without consequence when and if it will perform, rendering the lending agreement illusory as Silo has no real obligation to do anything.  Therefore, Kickhass respectfully requests that the Court should determine that the entire lending agreement is void *ab initio*, as it is illusory, void for lack of mutuality, obligation, and consideration, and as such, against public policy.

71.     The Supplier Receivable Sales Agreement also contains unlawful punitive provisions for late payments in violation of California law.

72.     Finally, because Silo was not licensed to engage in commercial lending or operate as a commercial bank, the Supplier Receivable Sales Agreement is unenforceable, as are any of the obligations proceeding therefrom.  Likewise, the Forbearance Agreement that subsumed the obligations Kickhass owed to Silo into the outstanding debts Silo owed to Plaintiff Jefferies is unenforceable as it proceeds from and seeks to enforce debts incurred under the unenforceable Supplier Receivable Sales Agreement.

73.     The terms of the Forbearance Agreement are, on their own, substantively and procedurally unconscionable and unenforceable.  They also seek to ratify amounts owed under an unenforceable Supplier Receivable Sales Agreement.  The accelerated payment, punitive provisions, and lack of mutuality, obligation, and consideration also render it void and contrary to public policy as well.

WHEREFORE, Kickhass prays for relief as set forth below.

## SECOND CLAIM
### Unjust Enrichment re: MSA & Forbearance Agreement
### (*Against Silo Technologies*)

74.     Defendant/Counterclaimant re-alleges and incorporates by reference the allegations contained in this Counterclaim and Cross-Claim as though fully set forth herein and incorporates them as though fully set forth herein.

75.     By their wrongful acts and omissions, Plaintiff was unjustly enriched at the expense of and to the detriment of Defendant/Counterclaimant or while Defendant/Counterclaimant was unjustly deprived.

76.     As set forth in greater detail above, Plaintiff charged onerous and improper late fees in violation of California law.  The late fee provisions were unreasonable under the circumstances existing at the time the contract was made, and operate as an unlawful liquidated damages clause under California Civil Code § 1671(b). Moreover, the usurious and unlawful transaction costs and punitive late fees paid with respect to the Sales Agreement and Forbearance Agreement were procured through coercion and duress, as set forth in detail above.

77.     Plaintiff will be unjustly enriched if allowed to retain such funds. Defendant/Counterclaimant is entitled to a refund of all such fees, and seeks an order of this Court disgorging Plaintiff of all improperly held late fees. Defendant/Counterclaimant also seeks costs of suit and other pecuniary loss to be proven at trial..

WHEREFORE, Kickhass prays for relief as set forth below.

## THIRD CLAIM
### Breach of Covenant of Good Faith and Fair Dealing
### (*Against Silo Technologies*)

78.     Kickhass re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 45 as though fully set forth herein.

79.     Defendant/Counterclaimant re-alleges and incorporates by reference the allegations contained in this Counterclaim and Cross-Claim as though fully set forth herein and incorporates them as though fully set forth herein.

80.     Implied in every contract or agreement is a promise of good faith and fair dealing. This means that each party agrees not to do anything to unfairly interfere with the right of the

---

other party to receive the benefits of the agreement and to refrain from taking actions that will injure the right of the other party to receive the benefits of the contract.

81.     Plaintiff Jefferies and its predecessor in interest Silo breached the implied covenant of good faith and fair dealing in a variety of ways that resulted in considerable harm to Dasagroup.  Among other things, Jefferies its predecessor Silo breached the implied covenant as follows:

a.     by refusing to advance further funds to Dasagroup under Silo Instant Pay Program by claiming, under pretext, that Dasagroup was over-extended and that there was no further funding availability under the program when, in fact, that was only because Jefferies, Silo's silent lender, was calling for Silo's payment under its larger lending facility with Jefferies (which had not been disclosed to participants like Silo);

b.     by declaring, suddenly and abruptly, that Dasagroup was over-extended on its factoring obligations and needed to make considerable payments on its account (even though this was not a recognizable concept in the parties' contract, was not part of the parties' course of dealing, and even though Silo was aware of Dasagroup's good payment history and its willingness to share information about its slow-paying accounts, customers, and inventory);

c.     by charging fees, expenses, penalties and other items against Dasagroup's reserve account without any transparency (which charges only contributed to Dasagroup's alleged over-extended position in the eyes of Silo and Jefferies);

d.     by attempting to exercise excessive control over Dasagroup's business by attempting to control Dasagroup's operations and insisting on immediate payment (from Dasagroup and customers like London Fruit) of Dasagroup's Instant Pay account to the exclusion of Dasagroup's other operational needs (including its payments to suppliers, vendors, and others), all of which operational control was not contemplated by the factoring arrangement and amounted to an improper exertion of control over Dasagroup's business, in contravention of the parties' agreement;

e.     by initiating contact with Dasagroup's customers, informing them that a debt was owed by Defendant/Counterclaimant as to other accounts receivables for other customers like London Fruit, and demanding that any invoices to be paid by those customers to

Dasagroup be paid directly to Jefferies (which payment demands were either false or exaggerated, especially with respect to customers whose invoices were not factored under the program or for whom there was no conceivable claim to an interest in all accounts receivable).

f.      by failing to acknowledge the broad force majeure clause at section 26 of the SRA that should have benefited Dasagroup for any explanations for delays in payments or operational difficulties beyond Dasagroup's reasonable control and that should not have resulted in any additional fees, penalties, or charges assessed against Dasagroup);

g.      by failing to acknowledge Dasagroup and Silo's developed course of dealing under the Silo Instant Pay Program in which Silo was understanding of operational difficulties that Dasagroup faced, including slow payment by Dasagroup's customers;

h.      by claiming that Dasagroup was in default under the Silo Instant Pay Program for pretextual reasons, at a point in time in which Dasagroup had been in substantial compliance with its obligations over the parties' course of dealing, when the real reason that an acceleration and/or immediate was demanded was to permit Silo to cure financial difficulties it had with Jefferies under the lending facility used to fund the Instant Pay Program; and

i.      by asserting invalid legal rights and threatening litigation against other customers whose invoices were not factored to exert extreme economic duress on Defendant/Counterclaimant to gain Dasagroup's acquiescence to the onerous terms of the Forbearance Agreement, which incorporated by reference the usurious charges to be assessed under the Silo Instant Pay contract.

82.     All of the foregoing conduct violated the implied covenant of good faith and fair dealing by Jefferies and its predecessor in interest Silo because they attempted to impose substantive terms and conditions beyond those to which the contract parties actually agreed and also unfairly frustrated Dasagroup's right to receive the benefits of the agreement it had actually made with Silo.

83.     As a direct and proximate result of Counter-Defendant Jefferies's breach of the covenant of good faith and fair dealing, Counter-Claimant/Cross-Claimant has suffered, and will continue to suffer, compensatory and special damages in an amount to be determined at trial that include, but are not limited to, lost profits, lost business opportunities, diminution in the value of

the Dasagroup's business, loss of goodwill, harmed business reputation, impairment to Dasagroup's business relationships, and resulting costs and expenses.

84.     As a further direct and proximate result of the breaches by Counter-Defendant Jefferies Funding, Counter-Claimant/Cross-Claimant is entitled to recover attorneys' fees and other enforcement costs incurred in connection with this action.

85.     Because Defendants' conduct alleged herein was done maliciously, oppressively, deliberately, and/or with intent to defraud, Plaintiff is further entitled to an award of exemplary and punitive damages pursuant to California Civil Code section 3294.

WHEREFORE, Counter-Claimant/Cross-Claimant prays for relief as set forth below.

### FOURTH CLAIM
### Common Count - Money Had and Received
### (*Against Silo Technologies*)

86.     Defendant/Counterclaimant re-alleges and incorporates by reference the allegations contained in this Counterclaim and Cross-Claim as though fully set forth herein and incorporates them as though fully set forth herein.

87.     Plaintiff Jeffries and its predecessor in interest Silo received money belonging to Defendant/Counterclaimant in the form of payments made by Dasagroup to Plaintiff that constituted either unlawful late-fee penalties imposed on Dasagroup and/or usurious interest payments charged by Plaintiff, as described in further detail above, under the terms of the Supplier Receivable Sales Agreement, Silo Instant Pay Program, and/or subsequent Forbearance Agreement between Jefferies and Dasagroup.  Among other things, Dasagroup seeks restoration of the following usurious charges: usurious late fees under section 6 of the SRA ranging from 2.5% to 3.5% assessed on late payments received 1 to 30 days or 31 to 60 days, respectively, following maturity on such payments, in addition to all such charges paid under the Forbearance Agreement and the additional forfeiture penalty of 3% assessed thereunder.  Dasagroup has paid several of these charges in an amount that has yet to be finally determined for trial, and Jefferies and Silo are not entitled to keep any such portion of such usurious charges in accordance with applicable law.

88.     In addition, Jefferies and Silo also received money paid by Dasagroup under duress and under protest, as described in greater detail above, under the terms of the Supplier

Receivable Sales Agreement, Silo Instant Pay Program, and/or subsequent Forbearance Agreement between Jefferies and Dasagroup.

89.     These funds were of use to Dasagroup (and would not have been paid but for their charge), and Plaintiff Jeffries benefitted from the receipt of these payments, which included payment of unlawful late fees and other penalties.

90.     Under principles of equity and good conscience, Plaintiff should not be permitted to keep these payments, which should be restored to Defendant/Counterclaimant in an amount to be determined at trial.

WHEREFORE, Counterclaimant prays for relief as set forth below.


## FIFTH CLAIM
### Unfair/Unlawful/Fraudulent Business Practices
### (*Counterclaim Against Silo Technologies*)

91.     Defendant/Counterclaimant re-alleges and incorporates by reference the allegations contained in this Counterclaim and Cross-Claim as though fully set forth herein and incorporates them as though fully set forth herein.

92.     California's unfair Competition Law ("UCL"), as codified in California Business & Professions Code § 17200 *et seq*. Prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

**Unlawful**

93.     Plaintiff Jefferies and Silo have participated with, aided and abetted, acted as agents of, or conspired with other persons to commit the following unlawful acts:

a.     charging unlawful charges and late fees under the Instant Pay Program (and the subsequent Forbearance Agreement) in violation of Civil Code § 1671(b), which charges were not reasonable under the circumstances existing at the time the contract was made;

b.     charging usurious charges and usurious late fees under the Instant Pay Program (and the subsequent Forbearance Agreement) in violation of Cal. Const. Art. XV, § 1(2);

c. charging late fees and other transaction fees under the Instant Pay Agreement that bear no relationship to actual costs of services and that also operate to exact a forfeiture;

d. violating Division 9 of the California Financial Code, the California Financing Law ("CFL"), which requires nonbank lenders and also brokers engaged in the business of making or brokering loans to obtain a California Financing license from the California Department of Financial Protection and Innovation (formerly the Department of Business Oversight), including, but not limited to, Cal. Fin. Code §§ 22100(a), 22004, 22009;

e. violating provisions of the California's Commercial Disclosure Law ("CDL"), Cal. Fin. Code §§ 22800-22806, including, but not limited to, Cal. Fin. Code §§ 22800(d)(1), 22800(n) and other provisions requiring non-exempt providers to provide certain disclosures "at the time of extending a specific commercial financing offer" to a recipient, including information about the total amount of funds provided; dollar cost of the financing; term or estimated term; the method, frequency, and amount of payments; and a description of any prepayment policies, *id*. § 22802(b)(1)-(5);

f. violating the implementing regulations for the CDL found at 10 Cal. Code Regs. ("C.C.R.") §§ 900 et seq., which include other rules of disclosure specific to the factoring industry, including requirements for disclosures of finance charges, estimated annual percentage rates, and limitations on the types of financing charges allowed, see, e.g., 10 C.C.R. §§ 912-913, 943;

g. violating federal Perishable Agriculture Commodities Act ("PACA"), 7 U.S.C. §§ 499a-499t by attempting to create a contractual security interest in proceeds of a statutory trust, which action is preempted by the statutory trusts that arise under federal law upon the sale of produce, which law prevails over any contrary provisions of the Uniform Commercial Code and cannot be evaded by private agreement. See Produce Pay, Inc. v. Izguerra Produce, Inc., 39 F.4th 1158, 1162 (9th Cir. 2022) ("While PACA protects the interests of suppliers and sellers of produce, it does not protect the interests of parties who are only lenders"); and

h. coercing Defendant/Counterclaimant to accept the onerous and unenforceable terms and conditions of the Forbearance Agreement under assertions of

---

DEFENDANT DASAGROUP HOLDING CORP.'S FIRST AM. THIRD-PARTY COMPLAINT

*Jefferies Funding v. Dasagroup Holdings et al.*
No. 3:24-cv-05639-SK

non-existent legal rights and threats of improper litigation against third parties like Dasagroup's customers who have no cognizable payment obligation to Jefferies or Silo.

**Unfair**

94.     Plaintiff Jefferies and Silo's conduct is unfair because it is immoral, unethical, unscrupulous, oppressive, and substantially injurious. The gravity of the harm resulting from their conduct pleaded above far outweighs its conceivable utility.  Among other things, Plaintiff Jefferies and Silo have participated with, aided and abetted, acted as agents of, or conspired with other persons to commit the following unfair acts:

        i.     lending money and/or brokering loans at excessive or hidden interest rates under the Silo Instant Pay Program that are unfairly high or that take advantage of vulnerable borrowers like Dasagroup and other purveyors of agricultural products who are protected by PACA;

        j.     charging transaction fees, late fees, and other charges under the Silo Instant Pay Program that are beyond legal limits in violation of California state statutes and the state usury law;

        k.     misrepresenting or concealing the true cost, fees, or terms of the Silo Instant Pay Program to mislead prospective borrowers;

        l.     misrepresenting or concealing the true lending arrangements and lending facilities (including the existence of silent lenders) that provide capital for the Silo Instant Pay Program to mislead prospective borrowers about the lending program and Silo's anticipated course of dealing in the program;

        m.     structuring the Silo Instant Pay Program in a manner intended to evade California lending laws;

        n.     structuring the Silo Instant Pay Program in a manner intended to conceal the true creditors extending credit under the program;

        o.     misrepresenting or concealing from borrowers the actual and potential conflicts of interest of creditors and silent lenders like Jefferies who provide financing to the Silo Instant Pay Program;

p.      not providing legally required disclosures about interest rates, fees, and repayment obligations under the Silo Instant Pay Program;

q.      by charging fees, expenses, penalties and other items against Dasagroup's reserve account without any transparency (which charges only contributed to Dasagroup's alleged over-extended position in the eyes of Silo and Jefferies); and

r.      structuring payment obligations, fees and charges under the terms of the Silo Instant Pay Program to maximize charges to be assessed against participants in the program based upon prevailing payment arrangements in the marketplace (which are known to largely operate on Net 30 payment terms that will almost certainly lead foreseeable delays triggering late fees to be assessed by Silo).

95.     The gravity of the harm resulting from this conduct far outweighs any conceivable utility of this conduct. There are reasonably available alternatives that would have furthered Jefferies and Silo's legitimate business interests, but they chose not to pursue them in violation of the UCL.

96.     Dasagroup could not have reasonably avoided injury from this unfair conduct and did not know, and had no reasonable means of learning, about the unfairness inherent in these practices.

**Fraudulent**

97.     Among other things, Plaintiff Jefferies and Silo have participated with, aided and abetted, acted as agents of, or conspired with other persons to commit the following fraudulent acts in violation of the UCL because it is likely to deceive a reasonable consumer as to the following:

s.      misrepresenting loan terms, including falsely stating the fees, charges, or repayment schedule expected under the Silo Instant Pay Program and advertising the program as lower cost than traditional factoring while hiding excessive fees in fine print;

t.      promising flexibility on repayment and no acts of collection against obligors in the event of non-payment;

u.      misrepresenting their legal rights and security interests to Dasagroup's customers with respect to non-factored receivables (and even as to customers whose invoices were not even factored under the program);

v.      structuring loans with fees charged on individual invoices to circumvent California usury laws and avoid limitations on interest to be charged legal interest rate caps

w.      misrepresenting that Silo would not "go after" a participant's customers in the event of nonpayment;

x.      misrepresenting that, in contrast to factoring, the fee structure of Silo's alternative financing arrangements were not dependent on the obligor's delay in paying on the receivables owed and that "heftier fees" would not be charged the "longer [customers] wait to pay their invoice";

y.      misrepresenting that, in contrast to recourse factoring, Silo's alternative financing arrangements would not place a supplier "on the hook for a customer's unpaid invoice";

z.      misrepresenting that, in contrast to factoring, Silo's alternative financing arrangements would allow Instant Pay participants to maintain "total control" over their client communications and avoid financiers "act[ing] as a collector";

aa.      misrepresenting that, in contrast to factoring, Silo's alternative financing arrangements would allow Instant Pay participants to avoid the risk of "straining [customer] relationships, "damag[ing] [their] business reputation," and "caus[ing] long term losses";

bb.      misrepresenting that, unlike "a bank that requires collateral or forces [one] to commit to a rigid contract with strict obligations," participants in Silo's alternative financing arrangements "can rely on Silo to provide . . . flexibility, security, cost-effectiveness, and a range of options to help . . . out of a bind";

cc.      misrepresenting that participants in Silo's alternative financing arrangements do not have to "stress over customers paying their invoice";

dd.      misrepresenting that participants in Silo's alternative financing arrangements "can bridge cash flow gaps so [they] can keep [their] business growing and growing";

ee.     misrepresenting that repayments to be made under the Silo Instant Pay Program "are flexible"; and

ff.     demanding payment from Dasagroup and its customers on usurious debts and interest charges that are void and rescindable under California law.

98.     As a direct and proximate result of the foregoing conduct, Defendant/Counterclaimant Dasagroup has suffered injury.

99.     Because Defendants' conduct alleged herein was done maliciously, oppressively, deliberately, and/or with intent to defraud, Plaintiff is further entitled to an award of exemplary and punitive damages pursuant to California Civil Code section 3294.

100.     Defendant/Counterclaimant brings this claim on behalf of itself and the public as a private attorney general pursuant to Business and Professions Code 17204.

101.     Pursuant to Business and Professions Code § 17203, Defendant/Counterclaimant seeks from Plaintiff restitution and disgorgement of all earnings, profits, compensation, benefits, and other gains wrongfully obtained by Plaintiff as a result of Plaintiff's conduct in violation of Business and Professions Code § 17200 et seq.

102.     Defendant/Counterclaimant also seeks reasonable attorneys' fees and costs under applicable law, including California Code of Civil Procedure § 1021.5.

103.     Pursuant to Business and Professions Code § 17204, Defendant/Counterclaimant seeks an order from the Court enjoining Plaintiff, and its predecessors, from continuing to engage in the acts set forth in this complaint, which acts constitute violations of Business and Professions Code § 17200 et seq.

WHEREFORE, Counterclaimant prays for relief as set forth below.

**PRAYER FOR RELIEF**

Defendant/Third-Party Claimant Kickhass prays for the following relief on this Third-Party Claim:

1.     For compensatory damages in an amount to be proven at trial, including economic damages in the form of lost profits, lost business opportunities, diminution in the value of the Dasagroup's business, loss of goodwill, harmed business reputation,

---

DEFENDANT DASAGROUP HOLDING CORP.'S FIRST AM. THIRD-PARTY COMPLAINT

impairment to Dasagroup's business relationships, and resulting costs and expenses.

2. For statutory damages, restitution, disgorgement, and/or other equitable relief according to proof and as the Court deems proper;

3. For the declaratory relief requested herein;

4. For exemplary or punitive damages in an amount to be proven at trial;

5. For prejudgment interest as permitted by law;

6. For costs of suit and reasonable attorneys' fees incurred herein; and

7. For such other relief as the Court deems just and proper.

## JURY DEMAND ON THIRD-PARTY COMPLAINT

Defendant/Third-Party Claimant demands a trial by jury on all triable issues in this Third-Party Claim.

Dated: March 18, 2025

Respectfully submitted,

MOYA LAW FIRM

*/s/ Mario A. Moya*

_____

Mario A. Moya

Attorneys for Defendant/Counterclaimant
DASAGROUP HOLDINGS CORP.
   d/b/a KICKHASS AVOCADOS